Edwin Ray HAYNES et al., Respondents,

v.

HAWKEYE SECURITY INSURANCE CO. and Clifford Eugene Linder, Appellants.

No. WD 29814.

Missouri Court of Appeals, Western District.

Feb. 26, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 3, 1979.

Application to Transfer Denied May 17, 1979.

As Modified May 18, 1979.

Roy A. Larson, Gordon N. Myerson, Kansas City (Morris, Larson, King, Stamper & Bold, Kansas City, of counsel), for appellants.

John C. Milholland and A. J. Anderson, Harrisonville, for respondents.

Before HIGGINS, Special Judge, Presiding, WELBORN, Special Judge, and PRITCHARD, J.

PRITCHARD, Judge.

Plaintiffs recovered judgments upon verdicts for actual and punitive damages done to them by the alleged joint, conspiratorial and overt execution of an agreement between the defendants wrongfully to hinder and delay plaintiffs as judgment creditors in the collection of their judgments, in total principal amounts, exclusive of interest and costs, of $105,000 for the four plaintiffs.

Respondents have moved for dismissal of the appeal for failure to comply with the rules. The issues, however, are fairly ascertainable from all the briefs, and appel-

lants have filed a supplemental brief revising points. The motion is overruled.

This case results from a long series of events beginning on April 28, 1956. On that date defendant Linder, who had been drinking, drove across the center line of U. S. Highway 71 near Peculiar, Missouri, and into a head-on collision with the Haynes' automobile. That collision resulted in the death of Mrs. Haynes, and injuries to the three children, and Edwin Ray Haynes, who were passengers, for whom the five actions were filed in the circuit court of Jackson County, Missouri, in which county Linder then resided. Hawkeye Security Insurance Co. was requested by Linder to defend the actions, and on the grounds as set forth in *Haynes v. Linder*, 323 S.W.2d 505, 509 (Mo. App.1959), Hawkeye refused to assume the defense (or settle the case within the policy limits). It was ruled in that case that omnibus coverage existed for Linder, and Hawkeye paid on two of the judgments against it the amounts of $5,513 and $5,373.

Before the trial of the five cases, which was to the court, the Haynes offered to settle within the $10,000 policy limits, but Hawkeye refused. Judgments were entered for the Haynes on February 28, 1957, as follows: Edwin Haynes, $20,000; Jon Haynes, $40,000; Michael Haynes, $10,000; Ruth Ann Haynes $20,000; and Edwin Haynes, for the wrongful death of his wife, $25,000. The Haynes thereafter, before beginning garnishment proceedings, again offered to settle all five judgments within the policy limits, but Hawkeye refused. After non est executions were returned as against Linder on the judgments of Edwin and Jon Haynes, garnishment proceedings were commenced against Hawkeye, which resulted in affirmance of the two judgments against it in *Haynes v. Linder*, supra.

Thereafter, on September 3, 1960, Linder filed action against Hawkeye, alleging that it, in bad faith, refused to defend the five suits filed against him, and refused to settle the suits and judgments within its $10,000 policy limits, although the settlements could have been made, which Hawkeye knew. As damages, Linder alleged that he was liable

for the judgments totalling $105,000.00 of the Haynes; he had been humiliated and embarrassed by the existence of the judgments and by garnishments and executions thereon, to his damage in the amount of $5,000.00; that as a result of Hawkeye's bad faith his driver's license and license plates were revoked and suspended by the Safety Responsibility Unit of the Department of Revenue because of Hawkeye's denial of insurance coverage, resulting in his diminished ability to earn a living, to his damage in the amount of $5,000.00; and that he was required to secure an attorney to defend the five suits, to his damage in the amount of $7,500.00. It was further pleaded by Linder that Hawkeye denies any further liability to the Haynes on their judgments, that a justiciable controversy exists among Haynes, Hawkeye and Linder as to further liability, and that he was entitled to a declaratory judgment (Chapter 527, RSMo 1949) as to Hawkeye's liability to the Haynes and to Linder. His prayer was for $17,500.00, and for an order that Hawkeye was liable to the Haynes for their $105,000 unpaid judgments, interest and costs, or in the alternative, that such amount be awarded him for payment to the Haynes. Linder made all of the Haynes parties to this suit. The Haynes filed an amended answer to Linder's petition generally admitting his allegations, except that Hawkeye should pay Linder the amounts of the judgments, and asking for an order that Hawkeye pay those judgments to them. By counterclaim and cross-claims, the Haynes prayed further that Hawkeye be held liable to them on the unpaid judgments and that the amounts be paid to them.

The trial upon Linder's petition and the counterclaim and cross-claims began on January 26, 1965. It was raised by counsel for Hawkeye that the sole issue was its bad faith as between it and Linder in failing to defend the Haynes' claims and failure to settle within the policy limits, a contractual matter, and they were utter strangers, not beneficiaries under the contract and had no standing in the lawsuit whatsoever. The objection was overruled at the time subject

to later briefing. The evidence received at this trial related to the services of Linder's counsel in investigating the Haynes' claims and in preparing for trial, as bearing upon counsel's entitlement to a reasonable attorney fee; Linder's suspension of his driver's license for one year, which caused him to lose wages on weekends; investigation of the collision between the Haynes and Linder vehicles by one Hughes; the offers to settle after judgment the Haynes' claims with Hawkeye; the trial of the garnishment proceedings against Hawkeye (which resulted in the judgments being affirmed, 323 S.W.2d 505, supra); and Hawkeye's knowledge as to the permission given by its named insured, Bacus, to Linder, to use his vehicle.

After a short adjournment the court took the case under advisement from January 29, 1965, after several intervening hearings and proceedings, until March 29, 1968. In the interim, on May 20, 1965, the Haynes filed objections to the dismissal of Linder's petition, in which they alleged, "according to their best knowledge, information and belief, that the plaintiff and the defendant Hawkeye have reached, or are in the process of negotiating, a settlement or compromise of the issues existing between them, which contemplates the dismissal of the plaintiff's cause of action." It was further stated by the Haynes that the dismissal without their joinder or consent, at that stage of the proceedings, "would result in the destruction of the valid existing legal and equitable rights of these defendants and would be to their great damage and prejudice." It was requested that the court refuse permission to Linder to dismiss his cause of action, with or without prejudice. Then, on June 10, 1965, Linder and Hawkeye, by attorneys, filed a stipulation of dismissal stating that Linder's petition shall be dismissed with prejudice as to Hawkeye, but "that nothing contained herein shall operate as a dismissal of the Cross-Claim of the defendant Haynes." The facts concerning the dismissal, as they bear upon the present appeal, are set out hereinafter.

On July 26, 1965, the Haynes filed their motion to set aside Linder's release of his claims against Hawkeye, and the "purported stipulation of dismissal." That motion set up that Linder had asserted and pleaded valid claims *ex delicto* and *ex contractu* for money damages against Hawkeye, which were choses in action owned by Linder and were assets which Haynes could not reach or attach or levy by execution or garnishment at law, and that the Haynes had directly shown and asserted their equitable right to the proceeds of Linder's claims against Hawkeye to the extent of their unsatisfied judgments against Linder, Linder's claims against Hawkeye being in excess of the amounts owed by him to Haynes. It was stated that both Linder and the Haynes invoked the equity jurisdiction of the court, and that the Haynes had asserted and do still assert "their claims in the nature of a common law creditor's bill in equity which is sometimes called an equitable garnishment, on the chancery side of the court, and have thereby claimed, and levied fixed equitable liens on, plaintiff's causes of action against Hawkeye-Security Insurance Company. These liens cannot be defeated nor discharged by private agreement between plaintiff and [Hawkeye], ex parte, the Court and Haynes. In equity and good conscience, such should not be permitted." It was further pleaded the release constituted a conveyance and assignment to hinder and defraud Linder's creditors, the Haynes, as equitable lienors, in violation of § 428.020, RSMo 1949, and as such was void. A motion was made and granted to reopen the case so that the court could have the full facts as to the purported settlement, and a further hearing was had as to those facts.

On March 29, 1968, the trial court rendered its judgment holding that the stipulation of dismissal with prejudice theretofore filed by Linder against Hawkeye was proper, was approved, and Linder's claim was dismissed with prejudice as to the date of entry of the judgment, the motion of the Haynes to set aside release and stipulation is overruled, "therefore, the Court does not need to determine those matters pertaining to the claim of the plaintiff Linder against

the defendant Hawkeye Security Insurance Company on the plaintiff Linder's claim for damages or for declaratory judgment." The court further found the issues on the Haynes' cross-claims in favor of Hawkeye, "but the right to recovery is one in tort for damages and that right is vested in the plaintiff Linder alone who became an insured" [under Hawkeye's policy]. It was further adjudged that the Haynes had no standing in the suit between Linder and Hawkeye because it had been dismissed with prejudice, and the Haynes had no cause of action against Hawkeye. The court further found that there was never conveyed to Hawkeye any settlement offer to settle the Haynes' claims as purported in the letter of their counsel to Hawkeye's counsel of April 18, 1958, that being "a mere recommendation and not an offer which could be accepted."

The judgment in favor of Hawkeye was affirmed in *Linder v. Hawkeye-Security Insurance Company*, 472 S.W.2d 412 (Mo. banc 1971), but upon the *sole* ground that the Haynes could not proceed by way of equitable garnishment because of applicable statutes [§§ 379.195, 379.200, RSMo 1969] limiting the judgment creditor to the insurance money provided in the contract of insurance, and "the permitting of such additional recovery from the insurer by the judgment creditor would be in disregard of the statute and would necessarily result in our indirectly repealing the limitations therein." The Supreme Court expressly declined to rule whether the trial court was correct in finding that there had never been a firm offer to settle within the coverage, and found it unnecessary to consider what, if any, claim for "excess coverage" Linder might have had against Hawkeye.

The rather detailed recitation of the history of this case is occasioned by Hawkeye's Point II in which it asserts that the Haynes' claims were barred under the doctrines of res judicata, estoppel, waiver and splitting of a cause of action as a result of prior litigation between the same parties. In *Abeles v. Wurdack*, 285 S.W.2d 544 (Mo. 1955), it was contended that certain facts were adjudicated in a prior suit on an express contract which barred plaintiff from maintaining the present suit on quantum meruit for commissions. The court said, loc. cit. 285 S.W.2d 546[1, 3], "A former adjudication on the same cause of action between the same parties is conclusive in the second proceeding as to every issue of fact which was or might have been litigated in the first, under what is called estoppel by judgment." [This doctrine would bar the Haynes from again litigating their entitlement to equitable garnishment, that cause of action having been determined adversely to them by the Supreme Court, thus settling the law.] *Abeles* goes on, "A judgment between the same parties on a different cause of action is binding *as to facts actually decided, and necessarily determined in rendering the judgment* (italics here added), under what is called estoppel by verdict. *State ex rel. Gott v. Fidelity & Deposit Co. of Baltimore, Md.*, 317 Mo. 1078, 298 S.W. 83. The suit on the express contract was based upon a different cause of action from that of the instant suit upon quantum meruit. The contracts upon which the claims are based are different, and it matters not that they both seek to recover for the same article, that is, services. (Citing cases and authority.) Therefore, the judgment in the suit by plaintiff on the express contract is res judicata as to those questions, points or matters of fact in issue which were essential to a decision in that case, and upon the determination of which the judgment was entered, but not to other issues." It was held that no "ultimate or supporting fact" was determined in the previous suit on the express contract. The *Abeles* principle is noted in 2 Freeman on Judgments, Fifth Edition, § 697, p. 1474, et seq., "In order that a judgment may operate as res judicata and be conclusive evidence of a fact sought to be established by it, not only must that fact have been in issue and determined in the former suit but it must have been a material fact in the case, one upon which the judgment in some way depended." See also Restatement, Judgments, § 68 (1942); Restatement, Second, Judgments, § 68 (April 15, 1977);

Vestal, Res judicata, Preclusion, V–246; *Crnic v. Croatian Fraternal Union of America*, 89 S.W.2d 683, 690[4] (Mo.App.1935); *Bayer v. Associated Underwriters, Inc.*, 402 S.W.2d 11, 13[3–5] (Mo.App.1966). In the instant case no essential fact thereto was adjudicated in the previous suit to establish entitlement to equitable garnishment. Hawkeye's cited case of *Varnal v. Kansas City*, 481 S.W.2d 575, 579 (Mo.App.1972), is thus distinguishable. The cause of action here asserted based upon the conspiratorial tort of the defendants is entirely different than that adjudicated in *Linder v. Hawkeye-Security Insurance Company*, 472 S.W.2d 412, supra, and there could for that reason be no splitting of a cause of action. There exists no basis for applying the doctrines of res judicata or collateral estoppel, and Hawkeye's Point II is overruled.

■ Hawkeye's Point I is that the Haynes failed to make a submissible case against it in that they failed to prove that the settlement of Linder's claim for bad faith (refusal to defend him or to settle the case within the policy limits) against Hawkeye constituted actionable conspiracy or fraud as alleged. Hawkeye argues that the Haynes attempt to circumvent the general proposition of law that a judgment creditor has no standing to sue the liability insurer for excess monies over and above policy limits, based upon the alleged bad faith of the insurer to its insured in failing to defend or settle. Of course, that matter was ruled by the Supreme Court in *Linder v. Hawkeye-Security Insurance Company*, supra, as to the remedy by way of equitable garnishment to reach amounts above policy limits, and all that opinion holds is that equitable garnishment is not available in the face of statutory provisions limiting recovery to policy limits. It is imminently correct, that *absent* other factors, such as the conspiracy to settle to defeat the Haynes' recovery here alleged, there existed a right to settle as between Linder and Hawkeye. But the allegations and proof here go far beyond the matter of a simple agreement to settle the lawsuit. The allegations pertain to the joint, conspiratorial and overt execution of an agreement between Linder and Hawkeye (and others) wrongfully to hinder and delay the Haynes as judgment creditors of Linder in the collection of their judgments. The evidence, which the jury could believe, adduced on that issue follows.

At the time that Linder filed his suit against Hawkeye alleging bad faith refusal to defend him and to settle the Haynes' claims within the policy limits, these events had transpired: On September 8, 1959, one of the Haynes' counsel wrote to Linder's private counsel advising him of the finality of the Haynes' judgments obtained on February 28, 1957, and that only $10,000 had been paid on them and that garnishments would be run on Linder's wages and income, and executions on any of his property that could be found. This apparently precipitated Linder's filing of his suit against Hawkeye. It was stipulated in the second trial (the record of which was received in this case) that Hawkeye, acting through its claims manager, Brandenburg, refused to defend Linder, and the claims manager redelivered the process, which had been delivered to him, to Linder's counsel on June 7, 1956, before answer was due. Linder's counsel testified in the second trial that he relayed information to Brandenburg that the Haynes' suits could definitely be settled before trial for less than $10,000. After the judgments were entered, one of Haynes' counsel wrote to Hawkeye's counsel, following telephone conversations, offering to settle all five cases for less than the policy limits. That letter used the word "recommendation" to settle, which is claimed on this appeal to have been a fact adjudicated in the second trial as not a firm offer to settle. As above noted, that fact was unnecessary to the final decision in the second trial, and a fair reading of counsel's testimony leads to the conclusion, which the jury could make in this case, that the word "recommendation" referred to the presentation of a settlement of the then three minor Haynes cases for approval by the court, and counsel had every reason to believe that the settlement would be approved, and thus there existed a firm offer to settle within the policy limits also after judgment.

The garnishment case, *Haynes v. Linder*, 323 S.W.2d 505 (Mo.App.1959), settled the question of whether Linder was an additional insured of Hawkeye under its policy issued to one Bacus who had given Linder permission to drive.

The first inkling that the Haynes' counsel had of the settlement negotiations between Linder and Hawkeye was a letter written to them on May 14, 1965, advising that an offer had been received from Hawkeye's counsel to settle Linder's claim for damages and counsel's claim for attorneys' fees; that the client was insistent upon acceptance of the offer; that counsel believed that the issues raised by the Haynes' counterclaims and cross-claims could be litigated and would not be affected by Linder's settlement and dismissal of the petition [these counterclaims and cross-claims were adjudicated against the Haynes on their theory of equitable garnishment against *Hawkeye*, 472 S.W.2d 412 (Mo.banc 1972)]; that the Haynes' legal position should not be altered by Linder's removal from the litigation; and that counsel would have preferred to see the litigation through even though it had meant a considerable investment of time without appreciable increase in the expected return [undoubtedly because of the existent unsatisfied Haynes' judgments], but counsel were not in the position to override Linder's desires in view of the offer.

Promptly, on May 18, 1965, Haynes' counsel forwarded a general execution in their case to the sheriff of Cole County, Missouri, with directions to serve a summons to garnishee on the Superintendent of Insurance, directed to Hawkeye. These papers were served upon the Superintendent of Insurance on May 24, 1965, and were transmitted to Hawkeye by him on May 25, 1965. The garnishments, motion and notice were served on Linder's counsel and on Hawkeye's counsel in Kansas City on May 18 and 19, 1965.

On May 18, 1965, Hawkeye issued its draft by air mail, "send to regional office intact", addressed to Clifford E. Linder, 11919 Merritt, Grandview, Missouri, payable to the order of Clifford Eugene Linder, "In full settlement of all claims of any nature against the Hawkeye-Security Ins. Co. and dismissal of Case # 628075, filed in Div. 3, Circuit Court of Jackson County, Missouri, at Kansas City. Policy Number A 479667. Claim Number 3–24043. Robert A. Bacus. Date of Loss 4–28–56." The draft was endorsed "Clifford Linder", and bears this notation on the reverse, "I'm accepting the guarantee of the Grandview Bank for Clifford Eugene Linder—WJB 5/24/65." The draft was marked paid May 25, 1965. Before a notary public on May 21, 1965, Clifford Eugene Linder signed a release for $1,250 to Hawkeye, from all actions, claims and demands which he had or may have on account of the April 28, 1956, accident. He further agreed to dismiss with prejudice his pending lawsuit against Hawkeye, and covenanted that he had not assigned the claim to any persons. [This release does not reference the Haynes' counterclaims and cross-claims.] An envelope in evidence, postmarked May 21, 1965, "Air Mail", is addressed to Hawkeye in Des Moines, Iowa, "Attn: Mr. W. J. Brandenburg." The $1,250 draft to Linder was sent by Hawkeye directly to him, bypassing the offices of its Kansas City counsel. The full general release executed by Linder was also mailed directly to him and it was never examined or approved by his counsel. One of Linder's counsel testified that they directed Hawkeye's counsel to mail the settlement draft and any release directly to Linder because they did not want to take it upon themselves to have any funds due Linder after they "had possibly not in our client's best interest" advised Haynes' counsel of the proposed settlement.

On June 10, 1965, Linder and Hawkeye, by counsel, stipulated that Linder's petition and cause of action against Hawkeye be dismissed with prejudice. It further recites: "The parties to this Stipulation further stipulate that nothing contained herein shall operate as a dismissal of the Cross-Claim of the defendant Haynes." The order of dismissal, and the refusal of the Haynes' motion to set it aside, precipitated the appeal of Haynes upon the theory that

they had a right to equitable garnishment, which was ruled against them in *Linder v. Hawkeye-Security Insurance Company*, 472 S.W.2d 412 (Mo.banc 1972).

On June 21, 1965, Hawkeye issued its draft for $2,750 to Linder's counsel for legal services to him in the 5 suits. *Haynes, et al. v. Linder*, and in *Linder v. Hawkeye-Security*. On August 18, 1965, the Haynes propounded interrogatory to garnishee, Hawkeye, asking if it had paid Linder, or to anyone acting as his agent or anyone on his behalf, any money, property or effects since the time the garnishment was served on it [May 24, 1965]. Hawkeye answered under oath, on September 29, 1965, that it had not paid any money, property or effects to Linder or anyone in his behalf.

In his previous testimony, given here in evidence, Linder testified that after the Haynes obtained their judgments, with the active cooperation of his wife, he put everything in her name, including the title to a new truck he bought in 1960. The family car was put in the wife's name; a vacation cabin on a lake was owned by the entirety; his sole source of income, wages as a cement finisher, were paid by checks, which were promptly taken home and given to his wife; his life insurance was purchased by his wife; and he testified that he held no assets in his name.

At the outset of the trial of Linder's suit against Hawkeye for its alleged bad faith refusal to defend or settle the cases within the policy limits, Hawkeye's counsel conceded in open court that it owed a reasonable attorney's fee to Linder's counsel in his representation of Linder who was determined to be Hawkeye's insured, and it stood ready, willing and able to pay the fee, but it could not be agreed as to what was a reasonable attorney's fee.

The present action for conspiracy has its basis in the law of fraudulent conveyances. It involves the conspiratory release by Linder, for an inadequate consideration, of a viable and valid cause of action or claim for damages. Indeed, § 428.020, RSMo 1969, speaks of the release of a claim in these words: "Every conveyance or assignment in writing, or otherwise, of any estate * * or in things in action, * * * made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands, * * * shall be from henceforth deemed and taken, as against said creditors and purchasers, prior and subsequent, *to be clearly and utterly void*." [Italics added.] At 37 C.J.S. Fraudulent Conveyances § 14, p. 859, this proposition is stated: "In most jurisdictions, however, by virtue of an express statutory provision, * * * choses in action fraudulently assigned or transferred may be reached by creditors in equity, * * *. The rule applies, for example, to promissory notes, * * *; *and it has also been applied to a claim for damages for a tort with respect to the person*. The release or cancellation of a debt or claim by an insolvent person may be fraudulent and void as to his creditors." Cited with respect to the last of the here italicized quote is the case of *Pickering v. Hartsock*, 221 Mo.App. 868, 287 S.W. 819 (1926). In that case there was a judgment against a physician for $5,000 for his malpractice, from which he appealed. He did not perfect the appeal, but he was insured by the Medical Protective Co. Hartsock was insolvent, as the attorney for his insurer found, and an offer of settlement was refused by plaintiff. The attorney entered immediately into negotiations with Hartsock for a release of the insurer's obligation under its contract with him, which contract was prepared by the insurer in advance at its office in Fort Wayne, Indiana, and which was dated the day of execution on the judgment. Garnishee insurer paid Hartsock $3,500 in the form of a check, also prepared in Fort Wayne, and arranged that it might be cashed by Hartsock. The reply to the garnishee (insurer's) answer set up that the release was fraudulent. The only difference between the *Pickering* case and the instant one is that Hartsock did not have a pending action against the Medical Protective Co., but only a contractual claim which he released. At page 823, the court noted that there was evidence from which the court could find an actual intention to de-

fraud in the so-called settlement by the parties to it; that it was not made (as here) in the usual course of business, but the insurer had Hartsock come to Kansas City for his payment, and assisted him in cashing the check so he might get the money in cash and thus be enabled to defeat his creditors by having his assets in such convenient form. The insurer knew (as here) that Hartsock was insolvent. "It was not a settlement as ordinarily understood, but merely a voluntary release of the cause of action upon the payment of money, or the release of a fully liquidated amount with nothing in dispute upon 'the payment of a lesser sum than that due. * * * The transactions shown in this record smack of sharp practice on the part of the garnishee, and, taken as a whole, show fraud strongly appealing to the courts for adjustment." The court affirmed the judgment but on condition that there by a remittitur of the $3,500 paid to Hartsock, the court assuming, absent evidence, that that amount was paid to plaintiffs.

Following the *Pickering* case in this state is *Graff v. Continental Auto Ins. Underwriters*, 225 Mo.App. 85, 35 S.W.2d 926 (1931), holding that a like attempted settlement of a policy liability between the insured judgment debtor and his insurer was in fraud of the rights of the judgment creditor. It should be noted that the *Graff* case refused to allow a credit for amounts paid by the garnishee to its insured in settlement of his contractual claim. In this, *Graff* is correct because, as said at page 933[17], the statute says the release is "utterly void as to plaintiff, and * * * the garnishee is liable * * * for the entire indebtedness under its policy without regard to the payment made in consideration of the purported release." A further reason would be that the fraudulent grantee or releasee (the insurer) was part and parcel of the fraud. Without doubt *Pickering* should no longer be followed with respect to its requirement of remittitur of amounts paid by the insurer to its insured judgment debtor. As to the liability of the fraudulent or collusive grantee for the full value of the property subject to the creditor's claim, see

also *Miller v. Kaiser*, 164 Colo. 206, 433 P.2d 772 (1967); *Damazo v. Wahby*, 269 Md. 252, 305 A.2d 138 (1973); 37 C.J.S. Fraudulent Conveyances § 444, p. 1297; 37 Am.Jur.2d, Fraudulent Conveyances, § 124, p. 803.

Other cases following the reasoning of the *Pickering* and *Graff* cases, supra, are: *Colgan, et al. v. Jones*, 44 N.J.Eq. 274, 18 A. 55 (1888) [where a judgment debtor assigned his claim for personal injuries for $330 to his attorney, who subsequently recovered judgment on the claim for $4,000. Held, fraudulent as to the judgment creditor insofar as the subsequent judgment exceeded a reasonable attorney's fee]; *Michel v. American Fire & Casualty Co.*, 82 F.2d 583 (5th Cir. 1936) [where plaintiffs had judgment for $6,200 against an insured, who after garnishment against the insurer, accepted $1,000 in cash and gave a release to the insurer for all obligations under the policy. Held, the release was in fraud of creditors and the issue made a jury question]; and more closely analogous to the case here, *Celano v. Frederick*, 54 Ill.App.2d 393, 203 N.E.2d 774 (1964) [where the complaint alleged that the defendants (including the two appealing defendant attorneys) conspired together and formed a deliberate purpose fraudulently to deprive Celano of funds due him from his judgment debtor, Frederick, by negotiating and agreeing to settle the latter's $6,000,000 suit theretofore pending, in violation of a court order requiring defendants in Frederick's suit to pay over to Celano money that Frederick might be or become entitled to by reason of any order or decree in his undetermined suit. Held, a cause of action was adequately stated, and the judgment was reversed and the case remanded]. Note also *C. Bewes, Inc. v. Buster*, 341 Mo. 578, 108 S.W.2d 66, 70[11–13] (1937), where the evidence was that Buster was insolvent, and the cancellation of leases without adequate consideration was fraudulent as to plaintiff entitling it to equitable relief against Buster and his releasee, there being existent badges of fraud as noted at page 71.

In his claim against Hawkeye for its alleged bad faith refusal to defend him and to

settle within the policy limits, Linder's measure of damages consisted of the balance of the Haynes' judgments against him, and interests and costs, plus his personal consequential damages. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750, 755 (1950); *Landie v. Century Indemnity Company*, 390 S.W. 558, 562[2] (Mo.App. 1965); Annotations, "Liability Insurer—Refusal to Defend", 49 A.L.R.2d 694, 711, 718; "Liability Insurer—Duty to Settle", 40 A.L. R.2d 168, 190, and especially page 214, as to a greater reason to settle after verdict against the insured. It was stipulated that prior to June 7, 1956, Hawkeye had conducted a complete and thorough investigation of the facts and circumstances surrounding the casualty and possession of, driving of and permission to drive the 1951 DeSoto, and had in its possession a true copy of the accident report of the Missouri State Highway Patrol; and that the policy of insurance was in full force and effect on April 28, 1956 (the date of collision) afforded coverage to Linder by adjudication (323 S.W.2d 505).

█ In this action at law, triable to a jury, for the tort of civil conspiracy of Linder and Hawkeye to settle and release his claim for bad faith refusal to defend and settle, under the foregoing evidence, the jury could reasonably have found these facts which support its verdict:

Linder had a good claim (a "vested right of recovery" as the Haynes say) with good possibility of recovery against Hawkeye. The judgment against Linder in favor of the Haynes was in the most part a liquidated ascertainable amount, upon facts which had been adjudicated as to his own liability. Additionally, he had his $17,500 claim for personal consequential damages. The amount of possible recovery by Linder against Hawkeye is thus not speculative as here contended by it, but the jury would be limited in fixing the Haynes' actual damages at the amounts of their judgments, interest and costs. It is noted that the jury gave only the principal amounts of the judgments as actual damages. Hawkeye had made its own investigation of the acci-

dent, from which it could not have but known that Linder was liable in possible substantial amounts for the Haynes serious injuries. Hawkeye knew the facts concerning Linder's having the status of an additional insured (under the policy omnibus coverage) to the policy covering Bacus as a named insured. Hawkeye knew that it could have settled the Haynes' claim within the policy limits both before and after judgments against Linder. As to the duty to settle, the *Zumwalt* case noted 228 S.W.2d at page 754, citing and quoting cases, that bad faith on the part of the insurer would be the intentional disregard of the financial interests of the insured in the hope of escaping the responsibility imposed upon it by its policy. The facts, investigated and known to Hawkeye, as to Bacus' granting to Linder the permissive use of the vehicle, should have caused it to assume the latter's defense. No fact here, as ultimately judicially determined (323 S.W.2d 505), excluded policy coverage. A refusal to defend, "even though based on an honest mistake of the insurer, is an unjustified refusal and renders the insurer liable for breach of contract." 49 A.L.R.2d at page 711[7].

The jury could further find that the consideration of $1,250 for Linder and $2,750 total for his attorneys paid by Hawkeye for the settlement of his claim and dismissal of his suit with prejudice was grossly inadequate as compared to the fixed amounts of the possible recovery against him of the Haynes' judgments, interest and costs; that Linder engaged in a continuing conspiracy with his wife to place all his assets, earnings and otherwise, beyond the reach of his creditors, including the Haynes. Hawkeye knew through its participation as a party in prior proceedings, wherein Linder's testimony was given, that he was insolvent. It would have been of little moment to Linder that his settlement for a paltry sum of his claim against Hawkeye, that $1,250 even being put beyond the reach of the Haynes because it was paid directly to Linder, would render their judgments worthless. Yet Hawkeye proceeded to relieve itself of any possibility of having to pay over to the Haynes and joined the pre-existing conspir-

acy of Linder and his wife by these overt acts, which the jury could find were further badges of fraud: There was a departure from ordinary business methods of handling release claims and dismissal of litigation through the parties' counsel; the release sent directly to Linder and executed by him was not read and approved; his counsel's name as co-payee was omitted in the draft to him; Hawkeye's counsel were used by it to transmit payment of fees paid to Linder's counsel; the release signed by Linder made no mention of an additional agreement to pay his counsel; the hurried acceptance by Hawkeye of its draft to Linder which was improperly endorsed (done after garnishment upon it and notice thereof to its attorneys); the false answers to interrogatories that Hawkeye had paid nothing to Linder or to anyone on his behalf; and that Linder unconditionally and without reservation released his claim against Hawkeye, without reference to the dismissal of his suit, which purported to reserve to the Haynes their rights asserted in their cross-claims against Hawkeye.

The elements of a civil conspiracy as set forth in *Dickey v. Johnson,* 532 S.W.2d 487, 502 (Mo.App.1975), are here present: (1) The two or more persons are Linder, his wife, and Hawkeye; (2) The object or purpose to be accomplished was to deprive the Haynes of any possibility of collecting their judgment, interest and costs; (3) The meeting of the minds is shown by the execution of Linder's release, direct payment to him, and a stipulation of dismissal of his claim against Hawkeye, which are also (4) overt acts; and (5) resultant damage to the Haynes by depriving them of the chance to recover on their judgments from any *proceeds* of Linder's claim. The Haynes made a submissible case, and appellants' Point I is overruled.

■■ Point III is that the court erred in giving Form of Verdict Instruction No. 26 because it did not allow the jury to find different amounts of punitive damages against each defendant, but compelled a finding of the same amount against both defendants. The judgments entered upon

verdicts were these: Edwin Ray Haynes, $40,000 actual and $26,500 punitive damages; Jon Haynes, $20,000 actual and $13,000 punitive damages; Michael Haynes, $10,000 actual and $6,500 punitive damages; and Ruth Ann Haynes, $35,000 actual and $21,000 punitive damages. The latter voluntarily remitted $1,641.90 from her award of actual damages. Hawkeye cites *State ex rel. Hall v. Cook,* 400 S.W.2d 39 (Mo. banc 1966). That case held merely that where partners were jointly sued for actual and punitive damages, it was proper to require the relators to answer interrogatories as to their wealth. The matters of the injustice of allowing the recovery of punitive damages against several defendants based upon evidence of the wealth of only one of them; and the injustice of allowing recovery against all defendants for punitive damages where there were differing degrees of culpability among them, was discussed. The case was one of discovery of evidence before trial, and not one upon the sufficiency of evidence to require the giving of separate instructions as to each defendant's liability for punitive damages. That much is clear by the dictum at page 42 of *Hall* where it was said that where the submission as to punitive damages was to be for a verdict against all defendants jointly for the same amount, evidence of the wealth of one defendant would be improper. The court had noted (page 41[3–5]) that findings in verdicts are authorized for different amounts of punitive damages against several defendants in the same action, depending on differing degrees of culpability and other circumstances *shown by the evidence.* The further dictum at page 42 is: "We hold that *where the evidence supports* such a separate submission the jury should be instructed that they may find punitive damages against several defendants in different amounts; and when this is done evidence of the wealth of each is admissible." [Italics added.] See Annotation "Punitive Damages—Apportionment", 20 A.L.R.3d 666. The import of the *Hall* case is only that separate verdict forms are required as to punitive damages which may be awarded only if the evidence justifies them—i. e.,

that there are varying degrees of culpability. Here, there was no evidence that Linder and Hawkeye were guilty of different degrees of culpability. All that is shown is that they acted in concert. And, aside from evidence that Linder was insolvent at the time he released his claim against Hawkeye to it in 1965, there was no evidence as to the wealth of either at the time of this trial. If Hawkeye thought that these two matters were in evidence, and that the forms of verdicts did not adequately cover the matter of separate verdicts for punitive damages, it should have requested them. Point III, under these facts and circumstances, is without merit.

By Point IV, Hawkeye levels seven *related* charges of error in the giving of the Haynes' four verdict direction instructions, each of which, except for substitution of the names of plaintiffs, is in this form:

"Your verdict must be for plaintiff _____ if you believe:

First, Hawkeye Security Insurance Company agreed with Linder that apart from Linder's right to recovery from Hawkeye of the amounts of the judgments which plaintiffs held against Linder, Hawkeye was liable to Linder for damages and attorney fees totaling $4,000.00; that Hawkeye would pay $2,750.00 directly to Linder's attorneys for Linder; that Hawkeye would remit the balance of $1,250.00 directly from Iowa to Linder at his home and that Linder would release and forever extinguish his right to recovery from Hawkeye of the amounts he owed the plaintiffs on their judgments, and

Second, defendants made said agreement with the intent to prevent any money for which Hawkeye was liable to Linder from being paid to plaintiffs on their judgments after the time of said agreement, and

Third, Hawkeye Security Insurance Company and Linder carried out their said agreement, and

Fourth, as a direct result of the defendants carrying out said agreement plaintiff _____ was damaged. Not in MAI".

■ Hawkeye first says (A) that the instructions constituted a roving commission to the jury and allowed for speculation and conjecture on its part, and were not free from argument. It is argued that the instructions assumed that Linder would have made a recovery in his suit against Hawkeye, and there was no evidence that he would have done so.

This is a cause of action in tort for damages resulting from the overt acts in carrying out a conspiratorial agreement. *Royster v. Baker,* 365 S.W.2d 496, 499[2–4] (Mo. 1963), and cases and authority cited, wherein it is said, "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to the plaintiff."

It should first be noted that Linder's claim against Hawkeye, above detailed, was for his damages for becoming liable to the Haynes upon their judgments ($105,000), and for his own consequential damages including his attorney fees, and that Hawkeye judicially admitted liability in some amount to Linder for attorney fees (a part of his claim). There is no speculation or conjecture, or assumption that Linder would have recovered against Hawkeye or in what amount, if so. The gist of the Haynes claim and their submissions in the verdict directing instructions is that the completed conspiratorial agreement resulted in the damage that any possibility of the Haynes having execution on their judgments was prevented and destroyed. The instructions speak of Linder's *right to recovery* of the Haynes' judgments, which right had already been proven, judicially determined as to Linder's policy coverage, and by facts showing a bad faith refusal to defend or settle the claims within the policy limits, which are alluded to above. The instructions submitted the ultimate facts to be found by the jury as to the existence of the conspiratorial agreement, the overt acts done in carrying it out, its purpose, and resultant damage.

Arguments (B) and (C) are that the verdict directing instructions assume that some

act on the theory of civil conspiracy was unlawful, or that defendant(s) in some manner acted unlawfully in accomplishing some illegal act, or that the agreement set out in Paragraph First was somehow unlawful or illegal. It is obvious that if those hypotheses were included in the instructions, which they were not, they would have been erroneous as being argumentative. The facts in evidence would permit the jury to find, as it did, under the submission of the instructions that the purpose of Linder and Hawkeye was unlawful, to "forever extinguish his right of recovery from Hawkeye * * with intent to prevent any money for which Hawkeye was liable to Linder from being paid to plaintiffs", thus amounting to a fraud upon the Haynes. Nor are the words "liable" and "right to recovery" argumentative and misstatements of the law as contended (D), because they are words of everyday common meaning, easily understood by the jury. The intent of Linder and Hawkeye to prevent any money being paid to the Haynes on their judgments, which Hawkeye says (E) is not supported by direct evidence, was subject to a legitimate inference by the jury—Linder was paid $4,000 on his claim for consequential damages, ignoring the Haynes' rights of execution, and Hawkeye had the very valuable benefit of being forever relieved of paying anything to Linder which would be subject to those executions. The damages of the Haynes were not speculative as contended (F). Through Linder's release of his vested right of recovery, the Haynes lost any possibility of collecting the fixed, ascertainable and liquidated amounts of their judgments. Point IV is overruled.

■ Point V is that the court erred in giving the punitive damage instructions because there was no evidence that Hawkeye was guilty of willful, wanton or malicious acts. The facts set forth above demonstrate that Hawkeye intentionally set about to relieve itself of any obligation to Linder, knowing he was insolvent, proceeding out of the usual course of business, falsely answering an interrogatory, and knowing that Linder had a vested right of recovery for the amounts of excess judgments against him. The intentional acts are embraced within the conspiratorial agreement between Linder and Hawkeye, and their wrongful purpose to render the Haynes' judgments worthless, to their damage. The instructions were amply supported by the evidence. Note the case speaking of an intentional wrongful purpose justifying submitting the issue of punitive damages, *Brown v. Sloan's Moving & Storage Company*, 296 S.W.2d 20, 26[13–15] (Mo.1956), and cases cited. Point V is overruled.

■ Hawkeye's Point VI is that Edwin Ray Haynes' case was barred by the statute of limitations. As noted, supra, Linder's claim against Hawkeye, and the Haynes' cross-claims, were dismissed by the trial court therein on March 29, 1968. Thereafter, appeals pended, and there was a petition for appeal to the Supreme Court of the United States which was denied, 405 U.S. 950, 92 S.Ct. 1176, 31 L.Ed.2d 227. The present action, sounding in tort for civil conspiracy, was filed on March 24, 1972. Hawkeye argues that the five year period of limitations, § 516.110, RSMo 1969, began to run in 1965, when the alleged wrongful acts were committed. Linder and Hawkeye filed their stipulation for dismissal on June 21, 1965, and the Haynes immediately objected and moved to set it aside. The stipulation was held in the bosom of the court upon the motion until March 29, 1968, when the motion was overruled. "It is held the period of limitation commenced upon the occurrence of the last of the series of overt acts (resulting in damage) under the conspiracy. (Citing case and authority)." *Kansas City v. Rathford*, 353 Mo. 1130, 186 S.W.2d 570, 577[21] (1945). Linder's claim for bad faith refusal to defend or settle the Haynes' claims against him pended until it was judicially determined as to the propriety of the stipulation of dismissal. The Haynes' present claims were filed well within the five year period of limitations. Point VI is overruled.

■ The garnishment of May 24, 1965, which was served upon Hawkeye, and upon its counsel and Linder's counsel, on May 18

and 19, 1965, was run only as to the judgment of Ruth Ann Haynes. By its Point VII, Hawkeye contends that the court erred in finding that all four of the Haynes made a submissible case, and in submitting their claims in the verdict directing instructions on the basis of any evidence on the garnishment, "in that Edwin, Jon and Michael Haynes were strangers to the garnishment." That garnishment was merely an evidentiary fact of the execution of the conspiratorial agreement to destroy the collectibility of the Haynes' judgments. Although all of the facts were known to Hawkeye as to Linder's insolvency, and the validity of his claim against it, in the face of the garnishment, it proceeded to pay Linder and his counsel and take his release for an inadequate consideration. Hawkeye, even then, did not hold up negotiations for the release, but proceeded to consummate it. The instructions do not refer to the garnishment, but only to the ultimate conspiratorial agreement made with intent to prevent any money being paid to the Haynes, to their damage. The evidence of the single garnishment was relevant to prove collusion, which may be inferred from the acts of the parties and surrounding circumstances. *Sandler v. Schmidt*, 263 S.W.2d 35, 40[10–11] (Mo.1953). Point VII is overruled.

Hawkeye, in its Point VIII, prays for remittitur of both actual and punitive damages because they are excessive, and are not supported by the evidence. It is argued that the damages should be reduced to "zero", but that cannot be because the verdict of the jury would be then a nullity. *Boone v. Richardson*, 388 S.W.2d 68, 76 (Mo.App.1965). It is also argued that the judgments against Linder (of which Hawkeye cannot complain, although urged in its point, and Linder himself not having participated personally in this appeal) amount to double recovery against him. Of course, there were original judgments against Linder for his tort-negligence in the operation of his vehicle. Then, there is a judgment against him for his conspiratorial tort in this action. These causes of action are entirely separate, but it is unnecessary

to this decision to consider whether Linder, assuming his future solvency, would be liable for executions on the original judgments against him. The matter of the Haynes' damages occasioned by the conspiracy has been above considered as not being speculative. No other reason is suggested in Hawkeye's argument which would be a basis for any remittitur, even of the punitive damages awarded. Point VIII is overruled.

As noted in the statement of facts, in the original accident, Linder drove across the center line into collision with the Haynes' vehicle. These facts bear on Hawkeye's failure to defend Linder, in part an issue in Linder's claim against it, which the jury was entitled to consider in this case as to Linder's purported settlement with it. The matter is not irrelevant as contended by Hawkeye in its Point IX, which is overruled.

The judgments are affirmed.

All concur.