GARY M. GAERTNER, Presiding Judge.
Appellant, Glaziers, Architectural Metal and Glassworkers Local No. 513, appeals from a jury verdict entered against it in the amount of $100,000.00. This dispute involves some twenty-five incidents which span an approximate three year time period. We will not endeavor to reiterate each of the twenty-five incidents in this opinion, but we do find it necessary to summarize the pertinent facts before we address the merits of this appeal.
Respondent, Missouri Mirror, Inc., is engaged in residential and commercial glass replacement in the St. Louis area. Mr. Ron Abling is the proprietor of the corporation and, from the record, appears to run the business without direction from or control by others. Abling[1] has operated the establishment under a variety of other names besides Missouri Mirror, including Missouri Glass and Crystal — Vue Glass and Mirror Corporation. Regardless of the name, Abling’s business has primarily consisted of residential and commercial glass replacement.
Abling maintains two employees on a full-time basis. These employees are not affiliated with any union and are paid between six and ten dollars per hour. Abling also utilized the services of members of the Iron Workers Union for some of his contracts. These workers are paid $25.00 per hour.
Appellant is a local labor organization whose members include those who install glass. Glaziers’ union workers earned approximately twenty-four to twenty-eight dollars per hour during the time of this dispute. Appellant, some time prior to April of 1986, took notice of respondent’s failure to pay his two full-time employees the prevailing area union wage rate and in April of 1986, began to picket respondent’s job sites. Appellant contended throughout the proceedings that the purpose of the pickets was to inform the public that respondent did not pay his employees the wages established by the Glaziers’ union.
Respondent testified at trial to twenty-five incidents involving alleged interference with respondent’s work. This testimony included eight separate incidents of violence: six incidents of broken windows on a job site; one incident where appellant’s business agent scraped Abling’s car with a sharp instrument; and one incident in which appellant’s agent spat upon Abling during an argument.
In addition to the above incidents, there was testimony that numerous, heated exchanges occurred between Abling and appellant’s business agents on respondent’s job sites. Abling testified that the picketers would often follow his work trucks to various job sites in order to set up their pickets and would often attempt to run respondent’s vehicles off of the road or abruptly cut in front of them.
*471 Respondent’s evidence also indicated that their work was often interrupted or stopped because of arguments between respondent’s employees and appellant’s agents or because appellant would inform the construction supervisor that respondent did not hire union Glaziers or pay Glaziers’ wages. This work stoppage would either result in respondent having to finish the job at night or during the weekends (at higher wage rates) or, sometimes, respondent was instructed to cease work and not return.
Respondent’s jobs were picketed a total of fourteen times. Either appellant’s own members would man the picket line or appellant would hire picketers at $40.00 per day. Three of these incidents involved merely picketing without violence, threats of violence or forced work stoppages. One incident involved appellant’s picketing of a different glass company and two incidents in evidence concerned minor work disruption which did not involve any picketing.
There was also evidence that, prior to the picketing by appellant, respondent had been able to perform custom mirror services because one of its non-union employees was well trained in that type of work. However, this employee testified that he quit respondent’s employ because of the harassment he endured from appellant’s activities. In addition to this loss of business, respondent offered expert testimony that respondent also suffered a loss in the value of his business in the amount of $383,000.00. The expert attributed this loss to an “outside or external force” since the management of the company had not changed.
On June 5, 1989, respondent filed his petition for damages against appellant. In this petition, respondent alleged that the appellant’s acts were in furtherance of its conspiracy to impede respondent's business, to intimidate and coerce respondent into hiring only employees who belonged to appellant’s union, and to compel and force others not to utilize respondent’s services. Appellant requested $1,000,000.00 as damages to his business.
The trial of the matter commenced on January 22, 1990, and culminated on January 25, 1990, when the jury returned its verdict in favor of respondent and awarded respondent $100,000.00 in damages. This appeal followed.
Appellant raises seven points of error for our review. However, we believe that these points actually concern four issues: Whether Federal preemption applies; the propriety of the verdict directing instruction; whether respondent made a submissi-ble case of civil conspiracy; and whether respondent failed to plead special damages. We find it necessary to address only the first two of these issues.
Appellant, throughout the proceeding below and now on appeal, asserts that this dispute does not lie within the jurisdiction of the State court. Appellant claims that, since its picketing activity is either arguably protected under the Federal Labor Management Relations Act, 29 U.S. C.A. § 141, et seq. or is arguably prohibited under this same act, the underlying action is preempted. We cannot agree.
Appellant correctly points out that, as a general rule, area standard picketing is an activity which a union organization can legally utilize against an employer. The relevant section of the Labor Management Relations Act reads as follows:
Nothing in this subparagraph ... shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services. 29 U.S.C.A. § 158(b)(7)(C).
The Labor Management Relations Act in 29 U.S.C.A. § 158(b)(4)(D), also provides that it shall be an unfair labor practice for a labor organization or its agents “to threaten, coerce, or restrain any person engaged *472 in commerce ... where ... an object thereof is—
[[Image here]]
“forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade.”
Thus, if the purpose of the pickets in our case was to inform the public about respondent’s practice of paying his employees less than the standard area wages, appellant’s acts were protected. If, however, appellant’s purpose in picketing respondent’s job sites was to coerce its employees (businesses and other contractors) into hiring only appellant’s members, then the conduct would be arguably prohibited under the above section.
Consequently, it has often been held that where the conduct at issue is either arguably prohibited or arguably protected, the otherwise applicable state law and procedures are ordinarily preempted. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 243-44, 79 S.Ct. 773, 778-79, 3 L.Ed.2d 775 (1959); Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 676, 103 S.Ct. 1453, 1459, 75 L.Ed.2d 368 (1983). The Supreme Court in Jones went on to state that “[w]hen, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in a local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act, we refuse to invalidate state regulation or sanction of the conduct.” Jones, 460 U.S. at 676, 103 S.Ct. at 1459.
In United Construction Workers, v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), Laburnum Construction had been awarded a contract to assist in the opening of a coal mine in Kentucky and was told by the coal mining companies involved that it would be awarded future work relating to this new coal mine. Laburnum then received a call from a field representative of the United Construction Workers of America (a part of the United Mine Workers) and was told by the representative that he was “working in United Mine Workers territory.” The Union representative went on to threaten to close down all of Laburnum’s work if he did not recognize the Union and threatened to send a large group of armed men to Laburnum’s work site. A group of men, although unarmed, did show up at the work site and persuaded some of Laburnum’s workers to join their ranks. Further threats of violence followed and, because of this dispute, the coal companies can-celled their existing contract with Laburnum and abandoned their award of future work for Laburnum. Laburnum sued the Union in state court in a common law tort action for compensatory and punitive damages. Laburnum, 347 U.S. at 657, 74 S.Ct. at 834.
In affirming the State of Virginia’s Supreme Court of Appeals’ refusal to apply preemption to the above facts, the U.S. Supreme Court first noted that, to the extent that Congress, through the L.M.R.A., prescribed a preventative remedy against certain unfair labor practices, the L.M.R.A. excluded, or preempted conflicting state procedure to the same end. Id. 347 U.S. at 665. However, where Congress has not provided procedures for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that state criminal penalties or liability for tortious conduct is preempted. Id. Thus, preemption does not prohibit a staté court’s ability to entertain a cause of action in tort which arises from Union picketing, or other activity.
Appellant thus properly points out that, as preemption applies to only the consequences of violence and threats of violence which appear in a labor dispute, United Mine Workers of America v. Gibbs, 383 U.S. 715, 729, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966), the trial court was required to separate the instances of alleged violence from the instances which involved merely picketing or other coercive tactics which, while possibly prohibited by the L.M.R.A., did not concern tortious conduct.
In Gibbs, the plaintiff, Paul Gibbs, had been hired as a superintendent of a new *473 mine which was to be opened in southern Tennessee. Plaintiff was also given a contract to haul the mine’s coal to a nearby railroad depot. Armed members of the local Union organization prevented the opening of the mine, threatened plaintiff and beat up an organizer for a rival Union. Within a few days, the international Union, the United Mine Workers of America, established a picket line which lasted for nine months without any violence. Plaintiff sued the international union for an unlawful conspiracy and an unlawful boycott to “maliciously, wantonly and willfully interfere” with his supervisory contract and contract for hauling coal. Id. U.S. at 720, 86 S.Ct. at 1136. A verdict was entered in favor of plaintiff.
The U.S. Supreme Court reversed this verdict, stating that state courts are only afforded the power to “grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order.” Id. U.S. at 730, 86 S.Ct. at 1141. Therefore, the damages which may be awarded based on a tort claim must be proximately related to the violence and threats of violence alleged. Id. Tort law remedies are not available to address the consequences of peaceful picketing or other Union activity. Id. 383 U.S. at 729, 86 S.Ct. at 1141. The foregoing does not mandate, however, that the evidence be somehow bifurcated by the trial court but only recognizes that the damages awarded must be the proximate result of the tortious conduct. Indeed, the Gibbs court went on to note that:
acts which in isolation are peaceful may he part of a coercive thrust when entangled with acts of violence.... In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peace-ful_ Such special facts, if they appeared in an action for damages after picketing marred by violence had occurred, might support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered. Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter.
Id., 383 U.S. at 731-32, 86 S.Ct. at 1142 (citations omitted). See also Angle v. Owsley, 332 S.W.2d 457, 461 (K.C.Ct.App., 1959).
In the case at bar, there were twenty-five incidents in evidence, three of which involved merely “peaceful picketing” and three of which involved activities which did not involve picketing of respondent’s job sites nor violence. It may have been possible for the trial court to have excluded from evidence these nonviolent occurrences from the remaining nineteen. However, the court was not required to do so.
Having then determined that the instant action was not subject to preemption and that the trial court was under no obligation to exclude certain evidence, we find no error in the court’s refusal to give appellants tendered withdrawal instruction which would have withdrawn evidence of the alleged nonviolent occurrences from the jury’s consideration.
Appellant next asserts that instructions number 6 and 8, appellant’s verdict directing instructions, were misleading, ambiguous and indefinite. The instructions were a non-M.A.I. approved instruction based on the case of Haynes v. Hawkeye Security Insurance Co., 579 S.W.2d 693, 705 (Mo.App., W.D.1979). The instructions at issue were as follows:
JURY INSTRUCTION 8
Your verdict must be for Plaintiff if you believe:
First, members of the Glaziers, Architectural Metal and Glassworkers Local No. 513 agreed to interfere with Plaintiff’s business operations; and
Second, that members of the Glaziers, Architectural Metal and Glassworkers Local No. 513 made said agreement with the intent to force Plaintiff to employ only members of the Glaziers, Architectural Metal and Glassworkers Local No. 513; and
*474 Third, that members of the Glaziers, Architectural Metal and Glassworkers Local No. 513 committed an overt act to carry out said agreement; and
Fourth, as a direct result of the members of the Glaziers, Architectural Metal and Glassworkers Local No. 513 carrying out said agreement, the Plaintiff was damaged.
# # * * * *
JURY INSTRUCTION 6
The term “overt act” as used in these instructions means a wrongful act in furtherance of, and designed to carry out, the purpose of the agreement.
Where there exists no applicable M.A.I. instruction for a charge, Rule 70.02(e) requires that an instruction “shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.” These same instructions must also be unambiguous and clear to a reasonably intelligent jury and must advise the jury as to the ultimate facts necessary for them to return a verdict. L.S. Douglas v. Hoeh, 595 S.W.2d 434, 437 (Mo.App., E.D.1980). Thus, the recitation of argumentative evi-dentiary facts is prohibited but an instruction which fails to recite the ultimate facts necessary for a jury verdict is likewise improper.
Appellant argues that the instant instructions do not specify the “overt acts” which ultimately must exist in order for liability to attach and further argues that instruction number 6, which defined “overt act”, did not cure this defect. Further, appellant asserts that without such direction, the jury was free to award damages based on either the violence or threats of violence it may have believed occurred or to base its award upon acts which are indeed lawful under the L.M.R.A.
In Haynes, the applicable portion of the instruction read that “[tjhird, Hawkeye Security Insurance Company & Linder carried out their said agreement.” Respondent is correct in pointing out that this is essentially identical to the present instructions. However, these portions cannot be examined in isolation.
In Haynes, the previous two portions of the verdict director clearly stated the facts necessary to sustain plaintiff’s cause of action. Haynes, 579 S.W.2d at 705. We held that the instructions stated the ultimate facts to be found by the jury relating to the existence of the conspiratorial agreement, the overt acts done in carrying it out, its purpose and resultant damage. Id.
The instructions in the present case do not come near reciting any facts which illuminate which acts need be found in order to hold appellant liable in conspiracy. This deficiency is magnified by the bounds within which a Union can be liable for conduct of this nature: namely, violence or threats of violence which invoke the state’s compelling interest in maintaining domestic peace. Gibbs, 383 U.S. at 730, 86 S.Ct. at 1141.
Instruction number 6 does no more than redefine “overt act" as a “wrongful act" without any reference to violence or threats of violence. In Gibbs, the Supreme Court similarly found that, in the context of a conspiracy claim against the defendant Union, the Court’s instructions failed to keep the conspiracy claim within proper bounds and did not focus the jury’s attention upon violence or threats of violence “as the essential predicate of any recovery it might award.” Id. 383 U.S. at 733-35, 86 S.Ct. at 1143. The trial judge in Gibbs had characterized plaintiff’s claim of conspiracy to be “wrongful in that it was to be accomplished by unlawful means, including violence and threats of violence.” Id. 383 U.S. at 734, 86 S.Ct. at 1143. Such a characterization was not enough in Gibbs for the Supreme Court to hold that those instructions limited the jury’s award to only the proximate consequences of the violence or threats of violence cognizable in a state cause of action.
Less direction is provided in the jury instructions in the case at bar. The Gibbs holding underscores the public policy expressed in the L.M.R.A. and in judicial opinions interpreting the interplay between preempted activity and permitted state regulation or sanction; that liability for tor- *475 tious conduct is compensable for traditional tort law for conduct marked by violence and imminent threats to the public order. Gibbs, 383 U.S. at 721, 86 S.Ct. at 1136.
The present instructions provided the jury with a “roving commission” to find appellant liable based on the impermissible violence or on activity which is subject to the preemption of the L.M.R.A., not a proper basis for tort liability. L.S. Douglas v. Hoeh, 595 S.W.2d 434, 437 (Mo.App., E.D. 1980).
The remainder of appellant’s points on appeal need not be addressed. The judgment of the trial court is reversed and the cause remanded.
CRIST and SIMON, JJ., concur.

. Hereafter, this court will refer to Ron Abling as Abling. We intend no disrespect to Mr. Abling by our manner of reference.