# LOCAL 926, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, ET AL. *v.* JONES

No. 81–1574.   Argued December 1, 1982—Decided April 4, 1983

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which POWELL and O'CONNOR, JJ., joined, *post*, p. 684.

*Laurence Gold* argued the cause for appellants. With him on the briefs were *Joseph Jacobs, Harris Jacobs, James T. Langford*, and *George Kaufmann*.

*Elinor Hadley Stillman* argued the cause for the National Labor Relations Board as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Lee, Norton J. Come*, and *Linda Sher*.

*Robert F. Gore* argued the cause and filed a brief for appellee.

JUSTICE WHITE delivered the opinion of the Court.

This case presents the question whether a state-court action brought by one who is a "supervisor"[1] within the meaning of the National Labor Relations Act § 2(11), 29 U. S. C. § 152(11), for interference by a union with his contractual relationships with his employer is pre-empted by the National Labor Relations Act (NLRA or Act).

I

Respondent Robert C. Jones[2] was offered a supervisory position by the Georgia Power Co. (Company). Jones reported for work on June 12, 1978. By agreement, he took vacation time after his second day on the job and reported for work again on June 20, 1978. On this latter date he was discharged.

---

[1] A supervisor is defined as follows:

"(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." § 2(11), 61 Stat. 138.

Supervisors are expressly excluded from the definition of employee in § 2(3), 29 U. S. C. § 152(3). Only "employees" are given rights under § 7, 29 U. S. C. § 157, which provides in relevant part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3)." 61 Stat. 140.

[2] We refer to Jones as respondent because, as we shall explain, see n. 7, *infra*, we review this case on writ of certiorari rather than on appeal.

Jones believed that the Company had been persuaded to discharge him by the union bargaining agent, Local 926 of the International Union of Operating Engineers (Union). The reason for the Union's hostility, he believed, was his decision years ago to work for a nonunion employer. On June 28, 1978, Jones filed a charge with the Regional Director of the National Labor Relations Board (Board) against the Union, alleging that the Union had "procured" his discharge, "and thereby coerced [the Company] in the selection of its supervisors and bargaining representative, because [Jones] had not been a member in good standing of said labor organization." Allegedly, this action violated §§ 8(b)(1)(A) and (B) of the Act.[3] App. to Juris. Statement 25a.

In a letter dated July 19, 1978, the Regional Director said that further proceedings on respondent's charge were unwarranted and that he would not issue a complaint.[4] He ex-

---

[3] Sections 8(a) and 8(b) define certain employer and union practices as unfair labor practices. As pertinent to this case, § 8(b), 61 Stat. 141, 29 U. S. C. § 158(b), provides:

"It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 . . . or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section . . . ."

Section 8(a)(3), 61 Stat. 140, as amended, 29 U. S. C. § 158(a)(3), makes it an unfair labor practice for an employer—

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."

[4] The following is the text of the letter:

July 19, 1978
Robert C. Jones
2954 Orchard Lane, S. E.
Atlanta, Georgia 30354
Re: International Union of Operating
    Engineers, Local 926
    Case 10–CB–2905

plained that there was insufficient evidence to establish that the Union had caused Jones' discharge; there was also a lack of evidence indicating that the Union had restrained or coerced the Company in the selection of its representative for purposes of collective bargaining. The Regional Director had instead come to the conclusion that Jones' discharge had been a part of changes in the Company's supervisory structure and that the Union had merely participated in discussions regarding the changes.

Instead of appealing to the General Counsel,[5] Jones proceeded to state court, suing both the Union and the Company. Count I of his complaint claimed that the Union had interfered with the contract between him and the Company. The allegations were simple. He pleaded that he had been a member of Local 926 from 1969 to 1974, when he resigned

___

Dear Mr. Jones:

The above-captioned case charging a violation under Section 8 of the National Labor Relations Act, as amended, has been carefully investigated and considered.

As a result of the investigation, it does not appear that further proceedings on the charge are warranted. The Region concluded that the evidence was insufficient to establish that the Union caused your discharge or that it restrained or coerced the Employer in the selection of its representative for the purposes of collective bargaining. Rather, it appears that the Employer implemented certain changes in its supervisory structure which included your removal from the project. While the Union did participate in discussions regarding the changes, there was no evidence that it engaged in any unlawful conduct regarding your status as a supervisor. I am, therefore, refusing to issue complaint in this matter.

Form NLRB–4938, Procedure for Filing an Appeal, is attached. The appeal period expires at the close of business on August 1, 1978.

Very truly yours,
/s/ Curtis L. Mack
Regional Director

App. to Juris. Statement 26a.

[5] Appeal to the General Counsel is provided by 29 CFR § 102.19 (1982). Respondent said he "didn't see much point" in taking such an appeal. App. 105 (deposition of Robert C. Jones, Feb. 20, 1979).

from the Union. More recently, the Company had offered him the job of equipment supervisor at one of its plants, and he and the Company had entered into a contract in reliance on which he had terminated his prior employment. The crucial allegation was that petitioner Thomas D. Archer, the business agent and representative of the Union, had "maliciously and with full intent, intimidated and coerced Georgia Power Company, or caused Georgia Power Company to be intimidated and coerced, into breaching its employment contract with the Plaintiff." Respondent prayed for a judgment of $80,000 against petitioners, to be composed of $25,000 in lost wages, $50,000 in punitive damages, and $5,000 in attorney's fees, interest, and costs. Count II of his complaint sought relief against the Company and alleged that the Company had breached its employment contract.

The Georgia trial court dismissed the complaint, concluding that the common-law tort action had been pre-empted because the subject matter of the complaint was arguably within the exclusive jurisdiction of the Board. The court observed that there was no justification for allowing joint federal-state control over the alleged conduct, since the state interest in protecting state citizens from the alleged conduct was insignificant and the risk of interference with the Board's jurisdiction was substantial.

The Georgia Court of Appeals reversed the dismissal of the case against the Union.[6] 159 Ga. App. 693, 285 S. E. 2d 30 (1981). Following Georgia precedent it considered to be controlling, *Sheet Metal Workers International Assn.* v. *Carter*, 133 Ga. App. 872, 212 S. E. 2d 645 (1975), and *International Brotherhood of Electrical Workers* v. *Briscoe*, 143 Ga. App. 417, 239 S. E. 2d 38 (1977), the State Court of Appeals held the cause of action not pre-empted because Georgia had a deep and abiding interest in protecting its citizens' contractual rights and because the cause of action, which sounded in

---

[6] The court affirmed the dismissal of the cause of action against the employer. The merits of that decision are not before us.

tort, was so unrelated to the concerns of the federal labor laws that it would not interfere with the administration of those laws. As an additional reason for not finding preemption, the court stated that the Union's acts were not even arguably within the ambit of § 7 or § 8 of the NLRA, thus purporting to distinguish *Iron Workers* v. *Perko*, 373 U. S. 701 (1963). The Georgia Supreme Court denied review, and petitioners appealed.

We postponed to the hearing on the merits consideration of our appellate jurisdiction. 456 U. S. 987 (1982). Petitioners now acknowledge that this is not a mandatory appeal.[7] We agree, but, treating the papers as a petition for writ of certiorari, we grant the petition. Concluding that the Georgia Court of Appeals erred, we reverse.

## II

The issue before us "is a variant of a familiar theme." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 239 (1959). The Court has often been asked to determine whether particular state causes of action or regulations may coexist with the comprehensive amalgam of substantive law and regulatory arrangements that Congress set up in the

---

[7] Petitioners initially argued in their jurisdictional statement that they were entitled to a mandatory appeal. They believed that this case fell within 28 U. S. C. § 1257(2), which allows parties an appeal as of right when a state statute is challenged in state court as being repugnant to the laws of the United States and the state court upholds the validity of the statute. The Georgia right-to-work law, Ga. Code Ann. § 54–905 (1981), recodified at Ga. Code Ann. § 34–6–24 (1982), was identified as the statute whose validity had been wrongly upheld. Petitioners now acknowledge that the Georgia Court of Appeals did not consider the question of whether the NLRA prohibited Jones' reliance on the State's right-to-work law; the court held only that the Georgia common-law tort action for interference with contractual relations was not pre-empted by the national labor laws. Petitioners' current perception appears correct. Because a common-law cause of action cannot be said to be a "statute" for purposes of § 1257(2), this case is not within our § 1257(2) appellate jurisdiction.

NLRA to govern labor-management relations affecting interstate commerce. *E. g., Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S. 180 (1978); *Farmer* v. *Carpenters,* 430 U. S. 290 (1977); *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966); *Garmon, supra.* Our approach to the pre-emption issue has thus been stated and restated. First, we determine whether the conduct that the State seeks to regulate or to make the basis of liability is actually or arguably protected or prohibited by the NLRA. *Garmon, supra,* at 245; see *Sears, supra,* at 187–190. Although the "*Garmon* guidelines [are not to be applied] in a literal, mechanical fashion," *Sears, supra,* at 188, if the conduct at issue is arguably prohibited or protected otherwise applicable state law and procedures are ordinarily pre-empted. *Farmer, supra,* at 296. When, however, the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act, we refuse to invalidate state regulation or sanction of the conduct. *Garmon, supra,* at 243–244. The question of whether regulation should be allowed because of the deeply rooted nature of the local interest involves a sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the Board's exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the State as a protection to its citizens. See *Sears, supra,* at 188–189; *Farmer, supra,* at 297.[8]

---

[8] The NLRA has been held to pre-empt state law and state causes of action relating to conduct that is neither protected nor prohibited, where it is determined that Congress intended the conduct to be unregulated and left to the free play of economic forces. See *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132, 140 (1976); *Teamsters* v. *Morton,* 377 U. S. 252, 260 (1964). This branch of the pre-emption doctrine is not at issue in this case.

Not only is this case a variant of a familiar theme, but we have heard this same tune before. In *Iron Workers* v. *Perko, supra,* the Court considered whether a common-law tort action for interference with a contract of employment was pre-empted by the NLRA. Perko, a member of the Iron Workers' Union, was employed at times as a superintendent and at other times as a foreman. While acting as a superintendent, he violated a Union rule, and his membership was suspended in consequence. Union representatives then told Perko's employer that because of Perko's transgression Union members would no longer take orders from him. Some weeks thereafter he was discharged on account of his dispute with the Union.

We concluded that Perko's common-law cause of action was pre-empted because it was founded on conduct that for several reasons was arguably within the ambit of § 7 or § 8. First, Perko was discharged both as a superintendent and a foreman. Even conceding that the position of superintendent was supervisory and beyond the reach of the Act, the foreman's position was arguably nonsupervisory and covered by the Act. Hence, Perko's discharge arguably violated the proscription of § 8(b)(1)(A) against a union interfering with the protected rights of employees and that of § 8(b)(2) against causing an employer to discriminate against an employee contrary to § 8(a)(3). Second, the Union arguably violated § 8(b)(1)(A), since causing the discharge of a supervisor might coerce employees, who would fear meeting their supervisor's fate, into forgoing their § 7 rights to engage in concerted action. Third, the Union's conduct might also have violated § 8(b)(1)(B), which prohibits unions from restraining or coercing "an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." Perko, we concluded, may well have had sufficient grievance-handling responsibilities to come within the realm of supervisors whose selection the Union could not seek to dictate.

Since Jones, unlike Perko, had a job only as a supervisor and not also as an employee, the Union does not rely on the first reason given in *Perko* for finding the challenged conduct arguably subject to the proscriptions of the Act. It is urged that the other two reasons given in *Perko* for such a holding are fully applicable here. The Union adds that Jones' cause of action threatens to punish the workers' arguably protected conduct in protesting, noncoercively, the selection of people for supervisory positions whether or not they entail collective-bargaining responsibilities. For these reasons, the Union submits that Jones' state-court action is preempted. We agree.

## III

In *Perko*, the Court thought the Board could reasonably construe § 8(b)(1)(A) to prohibit the discharge of a supervisor for failure to observe Union rules because the discharge would inevitably tend to coerce nonsupervisory employees to submit to Union regimentation and hence coerce them in the exercise of their § 7 rights. In that event, the Board could also order the Union to reimburse the supervisor for his lost wages. The Board's subsequent holdings apply a variant of this approach in the construction industry, where it is not unusual for workers to fluctuate, as Perko did, 373 U. S., at 706, between supervisory and nonsupervisory positions. In *Local Union No. 725, Plumbers*, 225 N. L. R. B. 138 (1976), enf'd, 572 F. 2d 550 (CA5 1978), the Union caused the employer to breach a promise to hire the charging party as a supervisor. For two reasons, the Board held that the Union had violated § 8(b)(1)(A) and was liable to the charging party for backpay. First, it was found that certain employees depending on Union job referrals had learned of the Union's conduct and were thereby intimidated in the exercise of their rights under the Act. Second, the Board reasoned that "because workers in the construction industry frequently cycle in and out of supervisory jobs, discrimination against [an individual] in his attempt to become a supervisor would carry

over to intimidate him once he again became a statutory employee." See 572 F. 2d, at 552. The Board's "fluctuating status" approach is arguably applicable to this case. Jones was employed in the construction industry, and, in view of the low-level supervisory position he held, it was not unlikely that he would from time to time serve in a nonsupervisory position.[9] It also is as clear here as it was in *Perko* that the Union's conduct was arguably prohibited by § 8(b)(1)(B), which forbids a union to coerce an employer in the choice of his bargaining representative. In *Perko*, there was some doubt whether Perko was a supervisor within the meaning of the Act; here there is no doubt in that respect. Of course, not every supervisor is a "representative 'for the purposes of collective bargaining or the adjustment of grievances'" within the meaning of § 8(b)(1)(B), *Florida Power & Light Co.* v. *Electrical Workers*, 417 U. S. 790, 811, n. 21 (1974). But in this case, Jones was to occupy the position of equipment supervisor; it is enough if in this position he would be authorized or expected to deal with grievances arising under the collective-bargaining agreement, *American Broadcasting Cos.* v. *Writers Guild*, 437 U. S. 411, 427, n. 25 (1978);[10] and Jones' com-

---

[9] Since the Board's decision in *Local 725*, it has become evident that the Board will not adhere to the general proposition voiced in *Perko* that the discharge of a supervisor for failure to abide by union rules is alone enough to discourage employees from exercising their § 7 rights. *Parker-Robb Chevrolet, Inc.*, 262 N. L. R. B. 402, 404 (1982). The Board asserts, however, that the holding in *Local 725*, reflecting the peculiarities of the construction industry, survives its later decision.

[10] Recognizing that an employer so frequently draws his collective-bargaining representative from the existing pool of supervisors, the Board has held that the Union violates § 8(b)(1)(B) by coercing the choice of a supervisor even without proving that the supervisor in question actually has collective-bargaining authority. The Court of Appeals for the Second Circuit has disagreed with the Board in this respect. *NLRB* v. *Rochester Musicians Assn. Local 66*, 514 F. 2d 988, 992 (1975). The Court of Appeals for the Third Circuit, on the other hand, has not entirely rejected the Board's position. *Newspaper Guild, Erie Newspaper Guild, Local 187* v. *NLRB*, 489 F. 2d 416, 420–422 (1973).

plaint filed with the Regional Director indicated that he would have collective-bargaining responsibilities. It is at least arguable that this was the case; and it was for the Board, not the state courts, to decide whether Jones was the kind of a supervisor who could invoke § 8(b)(1)(B). We thus agree with the Union and the Board that the Union, if it was responsible for Jones' discharge, arguably coerced the Company in the choice of its collective-bargaining representative.

## IV

For several reasons, none of them sound in our view, the Georgia Court of Appeals thought that the Act did not pre-empt the cause of action that Jones submitted to the state courts. First, the Court of Appeals may have interpreted the Regional Director's letter as indicating that the Board lacked jurisdiction to adjudicate Jones' complaint because of Jones' supervisory status. That is plainly not the case, for the Regional Director's statement did not decline jurisdiction but addressed the merits of the complaint. See generally *Garmon*, 359 U. S., at 245–246.

Second, the Court of Appeals believed that the Regional Director's rejection of the complaint for insufficient evidence of a violation satisfied all of the interests of the federal law and cleared the way for a state cause of action. If this position was grounded on the notion that supervisors do not have a cause of action in any circumstances, it is contrary to Board cases and to *Perko*. If, as seems more likely, the argument is that the complainant adequately submitted his dispute to the Board, it is untenable. Jones did not exhaust his administrative remedies, for he did not appeal to the General Counsel. Beyond that, the *Garmon* pre-emption doctrine not only mandates the substantive pre-emption by the federal labor law in the areas to which it applies, but also protects the exclusive jurisdiction of the Board over matters arguably within the reach of the Act. Even if Jones had satisfied ordinary primary-jurisdiction requirements, which he did not, he

would not have taken adequate account of the decision of Congress to vest in one administrative agency nationwide jurisdiction to adjudicate controversies within the Act's purview. Matters within the exclusive jurisdiction of the Board are normally for it, not a state court, to decide. This implements the congressional desire to achieve *uniform* as well as *effective* enforcement of the national labor policy.

In addition to relying on the reasoning of the Georgia Court of Appeals, Jones argues that there should be no preemption because the state cause of action and the unfair labor practice charge are not sufficiently alike. Jones relies on *Sears, Roebuck & Co.,* where we said that "the critical inquiry" in deciding whether a state claim is pre-empted because the challenged conduct is arguably prohibited by the federal labor laws is "whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board." 436 U. S., at 197. Jones asserts that a § 8(b)(1)(B) unfair labor practice claim is made out only by proving coercion of an employer in the selection of its bargaining representative, whereas, he explains, to make out his state cause of action it need only be shown that the Union caused, either coercively or noncoercively, the employer's selection of a supervisor. Because federal law does not forbid noncoerced, but union-caused discharges, it is said that the state cause of action is as distinct from the federal unfair labor practice claim as were the causes of action this Court found not preempted in *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966); *Farmer* v. *Carpenters,* 430 U. S. 290 (1977); and *Sears, Roebuck & Co.* v. *Carpenters, supra.*[11]

---

[11] In *Linn* v. *Plant Guard Workers,* we held that an action for a malicious and injurious libel in the course of a labor dispute, although an unfair practice and prohibited by the Act, was not pre-empted since it was unprotected conduct and since remedying injury to reputation was of only slight concern to the national labor policy and was a matter deeply rooted in state law. For similar reasons, in *Farmer* v. *Carpenters* we held that insofar as

We reject this argument. First, the argument concedes that the state cause of action is pre-empted to the extent that it covers coercive influence on the employer; and we note that Jones' complaint in the state court alleged that the Union agent had "intimidated and coerced" Georgia Power into breaching its contract with Jones. Jones thus sought to prove a coerced discharge and breach of contract, the very claim that is concededly pre-empted. Second, permitting state causes of action for noncoercive interference with contractual relationships to go forward in the state courts would continually require the state court to decide in the first instance whether the Union's conduct was coercive, and hence beyond its power to sanction, or noncoercive, and thus the proper subject of a state suit. Decisions on such questions of federal labor law should be resolved by the Board.

Third, even if the Georgia law reaches noncoercive interference with contractual relationships, a fundamental part of such a claim is that the Union actually caused the discharge and hence was responsible for the employer's breach of contract. Of course, this same crucial element must be proved to make out a § 8(b)(1)(B) case: the discharge must be shown to be the result of Union influence. Even on Jones' view of the elements of his state-law cause of action, the federal and state claims are thus the same in a fundamental respect, and here the Regional Director had concluded that the Union was not at fault.

This was not the case in *Sears*. There the state-court action was for trespass. It challenged only the location of the Union picketing. The unfair labor practice charge, however, would have focused on whether the picketing had recognitional or work reassignment objectives, issues "completely

the state-court suit rested on claims of discriminatory hiring hall referrals and breach of contract, it was pre-empted, but that it was not pre-empted and could go forward insofar as it alleged the outrageous and intentional infliction of emotional distress. We deal with *Sears, Roebuck & Co.* in the text, *infra*, this page and 683.

unrelated to the simple question whether a trespass had occurred." 436 U. S., at 198. Permitting the trespass action to go forward accordingly created "no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices." *Ibid.* The same cannot be said here. The Regional Director concluded that the Union had in no way been responsible for Jones' discharge. That same issue of causation would have been presented for decision had Jones' case come before the Board, just as the issue would recurringly be at the core of § 8(b)(1)(B) cases. Despite the Regional Director's determination, and the Board's undoubted jurisdiction to decide the issue had a complaint issued, Jones sought to relitigate the question in the state courts. The risk of interference with the Board's jurisdiction is thus obvious and substantial.

We thus cannot agree that Jones' efforts to recover damages from the Union for interference with his contractual relationships with his employer was of only peripheral concern to the federal labor policy. Our decisions in *Perko* and its companion case, *Plumbers* v. *Borden,* 373 U. S. 690 (1963), refute Jones' submission. They also foreclose any claim that Jones' action against the Union for interference with his job is so deeply rooted in local law that Georgia's interest in enforcing that law overrides the interference with the federal labor law that prosecution of the state action would entail.

Beyond this is the proposition, pressed by the Union, that although an employer may not be coerced in its choice of a collective-bargaining agent employees have the protected right to exert noncoercive influence on the choice of low-level supervisors.

"[C]ourts have generally held over Board protest that employees' strikes over changes in even low level supervisory personnel are not protected. *See Henning & Cheadle, Inc.* v. *NLRB,* [522 F. 2d 1050, 1055 (CA7

1975)]; *American Art Clay Co.* v. *NLRB*, [328 F. 2d 88, 90–91 (CA7 1964)]; *Dobbs Houses, Inc.* v. *NLRB*, [325 F. 2d 531, 538–539 (CA5 1963)]. On the other hand, courts have found protected the writing of letters expressing opposition, *NLRB* v. *Phoenix Mutual Life Insurance Co.*, 167 F. 2d 983 (7th Cir.) *cert. denied*, 335 U. S. 845 . . . (1948), or the simple voicing of complaints, *NLRB* v. *Guernsey-Muskingum Elec. Coop., Inc.*, 285 F. 2d 8 (6th Cir. 1960). By thus examining both the substantive interest and the means of advancing it, courts have balanced more finely the competing interests involved. The result is a general absence of *per se* rules." *Abilities and Goodwill, Inc.* v. *NLRB*, 612 F. 2d 6, 9 (CA1 1979).

Thus, had Jones' complaint come before the Board, his complaint would arguably have been rejected on the ground that the Union's conduct in this case was protected activity.

Finally, the argument is made that Jones should be permitted to go forward in the state court because he could be awarded punitive damages and attorney's fees, whereas he would be limited to backpay if his complaint had gone forward before the Board. But such a claim was squarely rejected in *San Diego Building Trades Council* v. *Garmon*, 359 U. S., at 246–247.

The judgment below is accordingly

*Reversed.*

JUSTICE REHNQUIST, with whom JUSTICE POWELL and JUSTICE O'CONNOR join, dissenting.

I disagree with the Court's conclusion that the National Labor Relations Act pre-empts the state-law claims in this case. On balance I think the result reached by the Court is wrong, though the question is a close one; more importantly, I cannot accept the Court's analysis of our recent decision in *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180 (1978).

Jones filed suit in the Georgia courts alleging that an agent of Local 926 (Union) had "maliciously and with full intent intimidated and coerced Georgia Power . . . , or caused Georgia Power . . . to be intimidated and coerced, into breaching its employment contract with plaintiff." In addition, Jones alleged, in an amendment to his complaint, App. to Juris. Statement 18a–19a, 2a, that the Union and Georgia Power Co. (Company) jointly conspired to interfere with his contractual relations. The Court apparently acknowledges, *ante*, at 682, and I agree, that Jones' complaint fairly may be read as stating two claims under Georgia tort law—a claim that the Union *coerced* the Company into firing Jones and a claim that the Union *noncoercively* caused his discharge.[1] The trial court dismissed Jones' complaint, reasoning that the tort doctrines on which it rested were pre-empted. The Georgia Court of Appeals reversed, ordering reinstatement of Jones' complaint. 159 Ga. App. 693, 285 S. E. 2d 30 (1981).

The Court recognizes that, if the conduct of the Union on which Jones' complaint was predicated was "arguably prohibited" by the Act, then the proper standard for pre-emption analysis is found in *Sears, Roebuck & Co.* v. *Carpenters, supra:* is "the controversy presented to the state court . . . *identical to* . . . or different from" the federal labor law claim. *Id.,* at 197 (emphasis added).[2] Other passages in

---

[1] The Georgia Court of Appeals also took this view of Jones' state-law complaint: "A ruling that the union was found *not* to have 'coerced' an employer in the selection of the employer's representative under the Act does not preclude this suit based on malicious *interference* with an employment contract." 159 Ga. App. 693, 697, 285 S. E. 2d 30, 33 (1981).

[2] The Court, while observing that the decision in *Iron Workers* v. *Perko,* 373 U. S. 701 (1963), involved a factual situation very similar to that in this case, also recognizes that *Perko*'s pre-emption analysis is no longer dispositive. In *Perko,* the mere fact that a state claim was based upon arguably prohibited conduct dictated the conclusion that the state claim was pre-empted. *Id.,* at 708 ("It is enough to hold, as we do, that it is plain on a number of scores that the subject matter of this lawsuit 'arguably' comes within the Board's jurisdiction to deal with unfair labor prac-

our *Sears* opinion elaborate upon this rule, requiring, for example, that a federal claim must be *"the same as* the controversy presented to the state court." *Id.*, at 198; see also *id.*, at 196–197.

The Court offers two basic arguments as to why Jones' claim of noncoercive interference with contractual relations and the federal labor law claims in this case were identical.[3] In doing so, it interprets the "identical controversies" standard of *Sears* in a new and unjustified manner. The Court first reasons that "permitting state causes of action for noncoercive interference with contractual relationships to go forward in the state courts would continually require the state court to decide in the first instance whether the Union's conduct was coercive, and hence beyond its power to sanction, or

---

tices"). This type of rigid interpretation of *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), does not survive our more recent decisions in *Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S. 180 (1978); *Farmer* v. *Carpenters,* 430 U. S. 290 (1977); *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966). As one commentator has remarked, "the *Garmon* test can now be described only by reference to its exceptions." Bryson, A Matter of Wooden Logic: Labor Law Preemption and Individual Rights, 51 Texas L. Rev. 1037, 1041 (1973).

[3] The Court also reasons that Jones "concedes that [his] state cause of action is pre-empted to the extent that it covers coercive influence on the employer; and we note that Jones' complaint in the state court alleged that the Union agent had 'intimidated and coerced' Georgia Power into breaching its contract with Jones. Jones thus sought to prove a coerced discharge and breach of contract, the very claim that is concededly pre-empted." *Ante,* at 682. This argument, of course, applies only to that portion of Jones' complaint that is based on coercive conduct, not on noncoercive conduct, see n. 1, *supra,* and accompanying text. Even as to coercive conduct, see *infra,* at 688–692, the argument is unpersuasive: it rests on the assumption that Jones' argument implicitly concedes that his coercive interference claim is identical to the controversy that the Board would resolve under §§ 8(b)(1)(A) and (B). I do not find any indication in respondent's brief of such a concession, and for the reasons given *infra,* at 688–692, I believe that Jones' coercive interference claim, like his noncoercive interference claim, was sufficiently distinguishable from the unfair labor practice charges at issue to avoid pre-emption.

noncoercive, and thus the proper subject of a state suit. Decisions on such questions of federal labor law should be resolved by the Board." *Ante,* at 682.

This argument rests on a basic misunderstanding of our prior decisions. In stating the "identical controversies" standard in *Sears,* we said that a claim brought in state court is unpre-empted unless "the controversy presented to the state court is identical to . . . *that which could have been, but was not, presented to the Labor Board."* 436 U. S., at 197 (emphasis added). Plainly, *Sears* envisioned that state courts would decide in the first instance whether a particular claim is pre-empted under the "identical" controversy standard. Likewise, *Farmer* v. *Carpenters,* 430 U. S. 290 (1977)— relied upon in *Sears'* formulation of the "identical" standard, 436 U. S., at 197—indicated that state courts may, and in fact must, sort out pre-empted from nonpre-empted portions of a complaint, even when no action before the Board has been taken. See 430 U. S., at 304–305. The *Farmer* and *Sears* models are analogous to the situation presented in this case. Just as state courts may distinguish the abusive *manner* of discrimination from discrimination itself, in cases modeled on *Farmer, supra,* at 305, and the pure trespass aspects of picketing from the objectives of the same picketing in *Sears* cases, they could distinguish claims of coercive interference from those of noncoercive interference in cases like this one. As *Farmer* and *Sears* hold, state courts are competent to make such judgments without interfering with federal labor law policy. In short, while it is correct that the Board, and not state courts, is charged with deciding national labor policy, it is equally clear that no such exclusive jurisdiction is conferred on the Board with respect to questions of pre-emption.[4]

---

[4] A state-law claim for intentional interference with contractual relations is as deeply rooted in and important to local concerns as the claims involved in *Farmer* and *Sears.* In *Farmer* v. *Carpenters, supra,* at 302–303, we noted that while the tort of intentional infliction of emotional

The second argument relied on by the Court is that "a fundamental part of . . . a [noncoercive interference with contractual relations] claim is that the Union actually caused the discharge . . . . [T]his same crucial element must be proved to make out a § 8(b)(1)(B) case: the discharge must be shown to be the result of Union influence. . . . [T]he federal and state claims are thus the same in a fundamental respect . . . ." *Ante,* at 682.

This view amounts to a substantial reformulation of the *Sears* requirement that state and federal controversies be identical before a claim based on arguably prohibited conduct is pre-empted. On its face the Court's definition of identical is dubious: two items or concepts are not ordinarily thought to be identical merely because they share a common element, or, in the Court's words, because they are "the same in *a* fundamental respect," *ante,* at 682 (emphasis added). Moreover, *Sears* supports no such definition of identical. *Sears* illustrated the standard by reference to our decisions in *Farmer* v. *Carpenters, supra,* which was given as an example of "nonidentical" controversies, and *Garner* v. *Teamsters,* 346 U. S. 485 (1953), representing controversies that are "identical." See *Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S., at 197. Given the reference, it is worth examining *Farmer* and *Garner* in somewhat greater detail.

In *Farmer,* one Richard Hill belonged to the local of a national union, which operated a hiring hall. Hill was apparently subjected to discrimination in job referrals from the hall and to a campaign of personal harassment. He filed suit in

distress was of comparatively recent origins, a State nonetheless "has a substantial interest" in protecting "the health and well-being of its citizens." Georgia has long sought to protect the right of its citizens "to earn a livelihood, and to seek redress against anyone who wrongfully causes him to be discharged from employment." *Wiley* v. *Georgia Power Co.,* 134 Ga. App. 187, 190, 213 S. E. 2d 550, 553 (1975); *Southern R. Co.* v. *Chambers,* 126 Ga. 404, 55 S. E. 37 (1906). There can be no doubt that safeguarding the integrity of contractual relations is an interest of paramount importance in an economy such as ours.

state court claiming, first, that the local had discriminated against him, and, second, that it had intentionally engaged in conduct causing him emotional distress. We observed that "these allegations of tortious conduct might form the basis for unfair labor practice charges before the Board," *Farmer* v. *Carpenters*, 430 U. S., at 302, and that Hill's tort claims were intertwined with "federally prohibited discrimination," hence creating "a potential for interference with the federal scheme of regulation." *Id.*, at 304.

Despite this inevitable overlap between state and federal claims, we held that Hill's claim of intentional infliction of emotional distress was not pre-empted. We relied on the fact that the state and federal claims—*despite sharing related factual bases*—would have had different "focus[es]." *Ibid.* Resolution of the state claim would turn on the abusiveness of the defendant's conduct, while the federal claim turned on whether "Union officials discriminated . . . against [Hill]." *Ibid.* Because the state claim required "something more" than the federal claim, *id.*, at 305, we concluded in *Sears* that the two claims were not identical.[5]

The Court's reformulation of the "identical" controversies standard of *Sears*—claims are identical if they share an im-

---

[5] In contrast, *Garner* v. *Teamsters* involved truly indistinguishable state and federal claims. The state statute at issue, titled the "Pennsylvania Labor Relations Act," prohibited certain types of union coercion in "language almost *identical* to" the NLRA. 346 U. S., at 488 (emphasis added). (In *Sears*, we noted that laws expressly governing labor relations are "more likely to involve the accommodation [of employee and employer interests] which Congress reserved to the Board." 436 U. S., at 198, n. 27.) Likewise, the subject of the state and federal suits in *Garner* was labeled by the Court as "the *same* controversy," 346 U. S., at 489 (emphasis added), and the Pennsylvania Supreme Court believed that the two suits involved " 'correction of the *identical* grievance.' " *Id.*, at 486, quoting *Garner* v. *Teamsters*, 373 Pa. 19, 28, 94 A. 2d 893, 898 (1953) (emphasis added). *Garner*, then, offers no support for the notion that claims may be "identical" for the purposes of *Sears* merely because they share the requirement of proof of certain facts; instead, our reliance upon the case in *Sears* stands only for the principle that identical really means identical.

portant factual element—is inconsistent with both *Sears* and *Farmer*.  In *Sears* the federal and state claims involved several common, fundamental factual questions—whether any picketing had occurred; if so, where; and whether the property owner consented to it or not.  These basic factual determinations, which the state courts and Board might resolve differently, would be critical to deciding both unfair labor practice claims and state trespass claims.  Likewise, in cases following the *Farmer* model, state courts may make credibility determinations regarding whether any discrimination occurred, and if so, whether it did so in a manner supporting a claim for intentional infliction of emotional distress.  The same factual issues would be involved in deciding an unfair labor practice charge under § 8 of the Act.  Our decisions in *Farmer* and *Sears* thus make clear that the mere risk of differing factual determinations by the Board and state courts is insufficient to require pre-emption.  Accordingly, the Court's reliance on the fact that the state and federal controversies at issue here are the same in one respect is misplaced.  Instead, *Sears* and *Farmer* demand a more searching inquiry into the relationship between state and federal controversies.

While recognizing that the question is not free from doubt, I would conclude that the state and federal controversies at issue here are not identical, and, therefore, that Jones' claims are not pre-empted.  The evident purpose of § 8(b)(1)(A) is to safeguard employees in their right, secured by § 7 of the Act, to join or refrain from joining concerted actions, see *NLRB* v. *Boeing Co.*, 412 U. S. 67, 71 (1973).  The Board's most recent discussion of the ability of a supervisor to assert a claim under § 8(a)(1) states:

> "The discharge of supervisors is unlawful when it interferes with the right of employees to exercise their rights under Section 7 of the Act, as when they give testimony adverse to their employers' interest or when they refuse to commit unfair labor practices.  The discharge of su-

pervisors as a result of their participation in union or concerted activity—either by themselves or when allied with rank-and-file employees—is *not* unlawful for the simple reason that employees, but not supervisors, have rights protected by the Act." *Parker-Robb Chevrolet, Inc.*, 262 N. L. R. B. 402, 404 (1982).

In order for a supervisor, such as Jones, to make a claim under § 8(b)(1)(A), therefore, he must show not only that *his* contractual relations were interfered with, but that because of this, the various rights guaranteed by § 7 of the Act to other persons—actual employees—were interfered with. This "entail[s] relatively complex factual and legal determinations"—such as what the rights of those employees are, how they were interfered with by action directed at Jones, and so forth—"completely unrelated to the simple question" whether Jones can show that the Union caused him to lose his job, see *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S., at 198. Because of these different factual issues, which reveal basically different focuses of policy, I do not think that Jones' state-law claims are pre-empted by § 8(b)(1)(A).[6]

In order to state a claim under § 8(b)(1)(B), a supervisor must show coercion of his employer in the choice of bargaining representatives. The provision "reflect[s] a clearly focused congressional concern with the *protection of employers*

---

[6]The policies effectuated by § 8(b)(1)(A) and the state tort sanction against intentional interference with contractual relations are entirely different. The former seeks to protect employees' right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, . . . to refrain from any or all of such activities. . . ." 29 U. S. C. § 157. The latter, however, is entirely unconcerned with these employee rights to concerted action; the state law instead seeks to protect a form of property—one's contractual relations with another. Cf. *Nottingham* v. *Wrigley*, 221 Ga. 386, 388, 144 S. E. 2d 749, 751 (1965). This concern with property rights is not unlike the state claim in *Sears*, which involved a state-law trespass action.

in the selection of representatives to engage in two particular and explicitly stated activities." *Florida Power & Light Co. v. Electrical Workers*, 417 U. S. 790, 803 (1974) (emphasis added). "Congress was *exclusively concerned* with union attempts to dictate to employers who would represent them in collective bargaining and grievance adjustment." *Ibid.* (emphasis added). In contrast, in order to make out a claim of intentional interference with contractual relations, the question whether the plaintiff was to act as a bargaining representative, or any other particular kind of employee, is entirely irrelevant. Likewise, the question whether the employer—with whose interests § 8(b)(1)(B) of the Act is "exclusively concerned"—is harmed by interference with an employee's contractual relationship is irrelevant to the state cause of action. As in *Sears*, the state-court action will focus on a far simpler and neater set of facts than would an action before the Board.[7] Because of these differences between the controversies that the Board would decide and those that state courts would decide, I am persuaded that Jones' state claims were not pre-empted.[8]

---

[7] Insofar as Jones' claim for *noncoercive* interference with contractual relations is concerned, the differences between the state and federal controversies would be even more marked. The controversy before the Board would involve difficult issues of coercion, while that in the state courts would focus merely on causation.

[8] I do not address the question, not faced by the Court, whether the proper disposition of the case is dismissal for want of a final judgment.