**CITY OF CLEVELAND ex rel. O'MALLEY, Appellee,**

v.

**WHITE, Mayor et al., Appellants.**

[Cite as *Cleveland ex rel. O'Malley v. White*, 148 Ohio App.3d 564, 2002-Ohio-3633.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 79833 and 79856.

Decided July 18, 2002.

</div>

Goldstein & O'Connor, Joyce Goldstein and Bryan P. O'Connor; Sarah J. Moore, for appellee.

Climaco, Lefkowitz, Peca, Wilcox & Garofoli, David M. Cuppage, Anthony J. Garofoli and John S. Zanghi; Roetzel & Andress and Robert B. Casarona, for appellants.

Reminger & Reminger, Richard C. Haber and Jonathan T. Hyman, for intervenor Anthony Allega Cement Co.

---

COLLEEN CONWAY COONEY, Judge.

{¶ 1}   The Mayor of Cleveland, Director of Law, Director of Public Service, Director of Finance, Commissioner of Purchases and Supplies, Director of Port Control, and the city of Cleveland (collectively the "city"), intervenor Anthony Allega Cement Contractor, Inc. ("Allega"), and plaintiff city of Cleveland ex rel. Walter O'Malley appeal the trial court's order issuing a permanent injunction, which requires that the electrical duct bank and manhole handling, assembly, and

installation ("duct bank work")[1] on the Cleveland Hopkins International Airport Runway Expansion Project ("the project") be apportioned equally between electricians and laborers. For the reasons below, we reverse the trial court's decision and dismiss O'Malley's taxpayer suit.

{¶ 2} In July 2000, the city of Cleveland enacted Codified Ordinances ("C.O.") 552–2000 and 1234–2000, which authorized the Director of Port Control to enter into contracts for the project. The city then began accepting bids from contractors and chose Allega as the general contractor of the project.

{¶ 3} The duct bank work involved in the project is specifically at issue. Allega has a contract with the Laborers International Union of North America, Local 860, which requires Allega to use employees of this union for all airport construction work, including the duct bank work.

{¶ 4} Between August and December 2000, representatives of the Electrical Workers, IBEW, Local No. 38, notified the Director of Port Control of possible labor and wage disputes surrounding the project. In December 2000, O'Malley, acting as the business representative of Local 38, wrote a letter to the Director of Port Control, citing bid specification C–22 and suggesting that a review of the city's records would reveal that Local 38 has customarily performed the duct bank work and should be awarded the work on the project.

{¶ 5} As a result, the Port Control and City Council began to investigate which trade traditionally performed the duct bank work. In January 2001, this matter became an issue at the city council's Aviation Committee meetings.

{¶ 6} In February 2001, the Port Control entered into a contract with Allega.

{¶ 7} Then, on March 14, 2001, the city council passed C.O. 454–01, which codified the finding of the Aviation Committee that electricians customarily performed duct bank work at the airport. On April 30, 2001, C.O. 454–01 was repealed.

{¶ 8} On April 9, 2001, O'Malley sent a written request to the city's law director asking him to institute a civil action alleging bid requirement violations.

{¶ 9} On April 25, 2001, O'Malley commenced this action by filing a verified taxpayer complaint for injunctive relief. The complaint sought to permanently enjoin the city from using nonelectricians to perform the duct bank work on the project. The second count of the complaint sought to permanently enjoin the city from compensating workers performing the duct bank work at less than the prevailing wage rate for electricians. O'Malley also sought attorney fees under R.C. 733.61.

---

1. A duct bank is an underground conduit or duct that provides a pathway for power, fiber optic, and communication cables.

{¶ 10} O'Malley simultaneously filed a motion for temporary restraining order and preliminary injunction, requesting the same injunctive relief described in his complaint. Allega intervened, and the court set the matter for hearing on the motion for temporary restraining order and preliminary injunction.

{¶ 11} In response, the city and Allega filed separate motions to dismiss the complaint or to stay the proceedings pending the outcome of the unfair labor practice charge filed by Allega against Laborers International Union of North America, Local 860. The basis of the charge was that Local 860 threatened to picket and strike to force Allega to assign particular work to its union members rather than to members of Local 38, the electrical workers.

{¶ 12} The trial court denied the motions to dismiss and again set the pending motions for hearing. The city opposed the motion for temporary restraining order and preliminary injunction, and the city again sought dismissal based on lack of standing to bring a taxpayer action. The trial court denied the city's request to dismiss the matter.

{¶ 13} After holding several hearings on the preliminary injunction, the trial court made the following order on June 8, 2001:

{¶ 14} "After considering all of the evidence, the Court finds that electricians and laborers have both customarily performed the work in question.

{¶ 15} "Based on this evidence, it is the order of the Court that the duct bank and manhole handling, assembly and installation shall be apportioned equally between the electricians and the laborers."

{¶ 16} The city filed its notice of appeal, which is designated case No. 79833, and sought a stay of the June 8 order.

{¶ 17} Allega filed its notice of appeal, which is designated case No. 79856, and a motion to stay the permanent injunction pending appeal. The trial court granted the stay of the June 8 order.

{¶ 18} O'Malley filed his notice of cross-appeal in case No. 79856, and the two appellate cases were consolidated.

{¶ 19} Upon initial review, we determined that the trial court's decision only disposed of the first claim, which concerned the use of nonelectricians to perform work on the Project. Thus, on April 23, 2002, this court sua sponte remanded the matter to the trial court for a final order on the wage claim. The parties filed a stipulated order for dismissal without prejudice of count two, which was granted by the trial court.

{¶ 20} The parties raise the following assignments of error on the issue of O'Malley's standing to bring a taxpayer action:

{¶ 21} The city maintains:

{¶ 22} "I. The trial court committed reversible error in failing to dismiss the purported taxpayer action for lack of standing."

{¶ 23} Allega also argues:

{¶ 24} "II. The trial court erred by permitting a taxpayer without standing to bring a taxpayer lawsuit."

{¶ 25} And O'Malley asserts:

{¶ 26} "II. The trial court erred when it refused to grant plaintiff's leave to amend the complaint to allow recovery as a taxpayer's action under the city of Cleveland Codified Ordinances."

■ {¶ 27} Responsibility for the enforcement of a public right to the performance of a public duty by a municipal corporation is imposed in the first instance upon the city's law director. See *State ex rel. Nimon v. Springdale* (1966), 6 Ohio St.2d 1, 35 O.O.2d 1, 215 N.E.2d 592, paragraph one of syllabus; R.C. 733.58.

■ {¶ 28} However, R.C. 733.59 provides:

{¶ 29} "If the village solicitor or city director of law fails, upon the written request of any taxpayer of the municipal corporation, to make any application provided for in sections 733.56 to 733.58 of the Revised Code, the taxpayer may institute suit in his own name, on behalf of the municipal corporation.  * * * No such suit or proceeding shall be entertained by any court until the taxpayer gives security for the cost of the proceeding."

{¶ 30} "The word 'taxpayer' as used in Section 733.59, Revised Code, contemplates and includes any person who, in a private capacity as a citizen, elector, freeholder or taxpayer, volunteers to enforce a right of action *on behalf of and for the benefit of the public,* and any such person is subject to the conditions imposed by that section, unless waived." *Nimon,* 6 Ohio St.2d 1, 35 O.O.2d 1, 215 N.E.2d 592, paragraph two of syllabus.  (Emphasis added.)

{¶ 31} The record reveals that prior to filing suit, O'Malley sent a written request to the city's law director seeking his action in the matter.  In addition, O'Malley has provided security for the cost of the proceedings.  Thus, the preliminary requirements to bringing an action under R.C. 733.59 have been met.

## A.   General Tax Fund

{¶ 32} However, the city still maintains that O'Malley lacks standing to bring a taxpayer's suit pursuant to R.C. 733.59.  It argues that O'Malley's status as a taxpayer fails because no general municipal tax funds support the project because the airport, by ordinance, is a self-sustaining enterprise.

{¶ 33} In response, O'Malley argues that his standing is based on statutory authority, and thus he is not required to show that he has a special interest in the funds at issue. Furthermore, O'Malley maintains that the general tax fund is in fact used to support the airport and to pay the salaries of airport decision-makers.

{¶ 34} When a taxpayer does not have statutory authority to bring a suit on behalf of a municipal corporation, he must show that he has a special interest in the funds that are the subject matter of the litigation. *State ex rel. Paul v. Ohio State Racing Comm.* (1989), 60 Ohio App.3d 112, 574 N.E.2d 587. Here, O'Malley has brought this action pursuant to R.C. 733.59; thus, he is not required to show a special interest in the funds at issue. Nonetheless, Councilman Michael Dolan, the Chairman of the Aviation Committee, testified that general funds are used to pay his salary, the salaries of airport staff members, and others responsible for making decisions regarding airport projects. Although the actual costs of the project are paid from a separate fund, the nexus between the airport decision-makers and general fund is sufficient to establish that contributors to the general fund have an interest in airport projects. Cf. *Tiemann v. Univ. of Cincinnati* (1998), 127 Ohio App.3d 312, 712 N.E.2d 1258 (a common-law taxpayer action where decision-making functions were performed by the university and funding for the university construction project came directly from university's special fund). Thus, O'Malley's status as a taxpayer with respect to funding does not fail.

## B. Public Right

{¶ 35} The city also argues that O'Malley lacks standing and that his taxpayer action fails because he has not established a violation of a public right.

{¶ 36} O'Malley contends that the public has a right to compel the city and its general contractors to abide by the terms of their competitively bid contracts. O'Malley also contends that the city has violated the public's right to safety by using nonelectricians for the installation of the electrical duct bank portion of the project. Thus, he argues that substantial public rights are at issue.

{¶ 37} Before we can determine whether O'Malley has standing as a taxpayer to bring the instant action, we must analyze the validity of the alleged public rights for which he brought suit.

### 1. Bid Specification Compliance

{¶ 38} O'Malley contends that the integrity of the competitive bid process has been compromised by the city's alleged failure to require its contractors to abide by the bid procedures.

{¶ 39}   At issue is bid specification C–22, with which O'Malley contends Allega failed to comply.   C–22 reads:

{¶ 40}   "The Contractor shall clarify and apportion * * * the performance of labor to the various trades involved in accordance with the local customs, rules and jurisdictional awards, regulations, etc., insofar as may be applicable to this work regardless of the classification as indicated in the specifications."

{¶ 41}   O'Malley argues that bid specification C–22 requires the use of electricians and electrical contractors rather than laborers for the duct bank work. However, Allega assigned the duct bank work to employees from the laborers' union.   Accordingly, O'Malley maintains that Allega did not act in accordance with the local customs and rules in apportioning the duct bank work and thus did not comply with bid specification C–22.

{¶ 42}   However, there is no specific requirement in the bid specification that requires the use of electricians for the duct bank work.   Further, evidence was presented that supported a finding that since 1988, employees of Local 860 have performed electrical duct work at the airport on at least five occasions.   Most significantly, while this matter was pending on appeal, the NLRB issued a decision in *Laborers' Internatl. Union of N. Am., AFL–CIO, Local Union 860* and *Anthony Allega Cement Contr., Inc.* (Sept. 28, 2001), No. 8–CD–480, 336 NLRB No. 28, 2001 WL 1220503, in which it determined that based in part on past practice and area practice, "the employees represented by Local 860 are entitled to perform the work in dispute." [2]   Accordingly, Allega and the city fully complied with bid specification C–22. Thus, because the city was in full compliance with the bidding process, no public right was violated.

### 2.   Public Safety

{¶ 43}   As previously stated, the evidence presented at trial revealed that on at least five previous occasions, Allega has used members of Local 860 on projects similar to the duct bank work at issue.   These previous projects were completed without harm to the safety of the public.   Thus, O'Malley has failed to establish that the use of nonelectricians creates a true public safety issue.

### 3.   Private Interest

{¶ 44}   There is no question that, as the business representative of the IBEW, Local 38, O'Malley has a private interest in seeking a determination that electricians should be assigned to perform the electrical duct bank work.

---

**2.**   As discussed below, we are bound by the NLRB's decision with regard to local custom.

▪ {¶ 45}   Nonetheless, a taxpayer has standing to enforce a public right, regardless of private or personal benefit.   *State ex rel. Cater v. N. Olmsted* (1994), 69 Ohio St.3d 315, 322–323, 631 N.E.2d 1048; see, also, *State ex rel. Ohio Academy of Trial Lawyers v. Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062; *State ex rel. White v. Cleveland* (1973), 34 Ohio St.2d 37, 63 O.O.2d 79, 295 N.E.2d 665.

{¶ 46}   However, when the taxpayer's aim is merely for his own benefit, no public right exists, and a taxpayer action pursuant to R.C. 733.59 cannot be maintained.   See *State ex rel. Caspar v. Dayton* (1990), 53 Ohio St.3d 16, 558 N.E.2d 49 (where the court held that police union members lacked standing in a taxpayer action seeking fringe benefits from the city.)

▪ {¶ 47}   We determine that no public rights are being protected through this suit.   Thus, O'Malley lacks standing to bring a taxpayer action pursuant to R.C. 733.59.   Accordingly, the trial court erred by denying the city's request for dismissal and by finding that O'Malley had standing to bring the instant action.

{¶ 48}   The city also raises the following assignment of error:

{¶ 49}   "II. The trial court committed reversible error in failing to dismiss the purported taxpayer action based on federal labor law preemption."

{¶ 50}   And Allega alleges:

{¶ 51}   "I. The trial court erred by failing to find that the federal labor law preempts plaintiff's claims."

{¶ 52}   As noted above, while this matter was pending, the NLRB issued its *Laborers' Internatl. Union* decision in which it determined that "the employees represented by Local 860 are entitled to perform the work in dispute."

▪ {¶ 53}   As a general rule, neither state nor federal courts have jurisdiction over suits directly involving activity subject to section 8 of the NLRA. *San Diego Bldg. Trades Council v. Garmon* (1959), 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775; *Bottle Beer Drivers, Beer & Soft Drink Bottlers & Allied Workers Local Union No. 1199 v. Dameron* (Dec. 4, 1998), 1st Dist. No. C–970922, 1998 WL 833609 (Gorman, J. concurring).   The reasons for this are simple: uniformity of decision and deference to the expertise of the NLRB. The NLRB has its own procedures for investigation, complaint and notice, and hearing and decision.   See *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776* (1953), 346 U.S. 485, 490, 74 S.Ct. 161, 98 L.Ed. 228; *Dameron,* supra.

{¶ 54}   In the labor action filed by Allega against Local 860, Allega alleged that Local 860 violated Section 8(b)(4)(D) of the NLRA. Thus, the NLRB action commenced by Allega directly involved activity subject to Section 8 of the NLRA. Accordingly, we must defer to the NLRB's decision regarding the issue of

whether members of Local 860 or Local 38 should be assigned the duct bank work on the project.

{¶ 55}  However, O'Malley contends that we should not defer to the NLRB's decision on the local-custom issue because the parties named in that action are different from the parties named herein.

██  {¶ 56}  However, which parties were named is of no consequence.  The fact is that the same *issue* raised herein was raised in *Laborers' Internatl. Union of North America, AFL–CIO, Local Union 860* and *Anthony Allega Cement Contr., Inc.*  Where both the NLRA claims and the state law claims share a fundamental element and create a sufficiently large risk of inconsistent decisions, the state law claims are preempted.  See *Local 926, Internal. Union of Operating Engineers v. Jones* (1983), 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368; *Dameron.*  Here, there is no question that the case at bar and the NLRB decision share fundamental elements and that the trial court's decision that apportioned the duct bank work to both Local 38 and Local 860 was not consistent with the NLRB's decision, which found that Local 860 is entitled to perform the duct bank work.  Thus, the trial court's decision is preempted by the NLRB's decision.  Accordingly, we reverse the trial court's decision and dismiss this matter due to O'Malley's lack of standing to maintain this action.

{¶ 57}  The city's remaining assignments of error are:

{¶ 58}  "III. The trial court committed reversible error in failing to dismiss the purported taxpayer action based on plaintiff's failure to exhaust available administrative remedies under the Davis–Bacon Act."

{¶ 59}  "IV. The trial court committed reversible error in creating a remedy without first finding that the contract was entered in violation of the city's corporate powers or in contravention of statutes or ordinances governing it."

{¶ 60}  "V. The trial court committed reversible error in its creation of a remedy by essentially rewriting the parties' contract so as to shift from the contractor to the city the responsibility for clarifying and apportioning the performance of labor."

{¶ 61}  "VI. The judgment is against the manifest weight of the evidence."

{¶ 62}  Allega's remaining assignments of error are:

{¶ 63}  "III. The trial court erred by permitting a taxpayer-plaintiff to enforce a contract to which he is not a party."

{¶ 64}  "IV. The trial court erred by finding that bid specification C–22 requires the use of electricians."

{¶ 65} "V. The trial court erred by apportioning the work between laborers and electricians because 'custom and practice' simply does not support that division of labor."

{¶ 66} O'Malley's last assignment of error on appeal is:

{¶ 67} "I. The trial court committed reversible error by not finding that the contract between the city of Cleveland and Allega requires electricians to perform the electrical duct bank and manhole work at Cleveland airport."

{¶ 68} Based on the foregoing analysis, the parties' remaining assignments of error are moot.

Judgment reversed
and cause dismissed.

TIMOTHY E. MCMONAGLE, A.J., and JAMES D. SWEENEY, J., concur.