[This opinion has been published in *Ohio Official Reports* at 69 Ohio St.3d 315.]

THE STATE EX REL. CATER, APPELLANT AND CROSS-APPELLEE, V. CITY OF

NORTH OLMSTED ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as *State ex rel. Cater v. N. Olmsted*, 1994-Ohio-488.]

*Mandamus to compel reinstatement as chairman of North Olmsted Civil Service*

*Commission—Removal of Chairman procedurally flawed but reinstatement*

*refused, when.*

(No. 92-1073—Submitted March 1, 1994—Decided May 18, 1994.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Cuyahoga County, No.

60689.

_____

{¶ 1} James Cater, appellant and cross-appellee, petitioned the Cuyahoga County Court of Appeals for a writ of mandamus to compel Thomas Stroh's reinstatement as Chairman of the North Olmsted Civil Service Commission ("commission"). Cater filed his suit as a taxpayer action against the city of North Olmsted, Mayor Edward Boyle, and members of the city council (collectively, "North Olmsted"), appellees and cross-appellants.

{¶ 2} Stroh was appointed to the civil service commission in 1986 to finish an unexpired term ending December 31, 1991. He became chairman in 1989, when two or three entry-level patrolman vacancies existed in the North Olmsted Police Department, and more vacancies were expected.

{¶ 3} The commission's rules and regulations required certification of the top three candidates on the eligibility list for a first vacancy on the police force, and, for any subsequent vacancy, the commission typically certified one additional name to be considered with the two previously certified, but unsuccessful candidates. Thus, in 1989, the commission certified three candidates to the city police chief for consideration. In September of that year, the chief asked for

additional candidates so he could complete background investigations and expedite the selection process. The chief promised to consider the candidates three at a time, in accordance with the commission's rules and regulations.

**{¶ 4}** By January 4, 1990, however, just four candidates had been certified, and only one vacancy had been filled. The civil service commission agreed to certify two more candidates, but newly elected Mayor Boyle still objected to the length of time the process was taking. Time became an even greater concern when, at a commission meeting on January 25, 1990, the police chief announced his retirement, and Boyle announced proposed legislation to create three or four new patrolman positions.

**{¶ 5}** In January 1990, the commission was comprised of Stroh, Robert Wendt, and Henry Robinson, who had just been appointed by Boyle. Apparently, these commissioners were not convinced of their authority to release more than one additional candidate's name per vacancy, and they solicited the city law director's advice and approval. The commission received this approval in a letter dated February 27, 1990, wherein the law director advised that the entire eligibilty list was a public record under Rule II(A)(1) of the North Olmsted Civil Service Regulations. The law director also observed:

"[I]n order to facilitate their efforts in completing the application process expeditiously, the appointing authority should be given the list of qualifying candidates."

**{¶ 6}** In March 1990, the city's eligibility list expired. To establish a new eligibility list, the commission administered a written aptitude examination to one hundred fifty-one applicants for the position of patrolman. Eighty-five applicants achieved a passing score. The commission then scheduled a physical agility test, the other qualification for the eligibility list, to be given on May 19, 1990. The thirty-five candidates who scored highest on the written test were invited to participate.

**{¶ 7}** On April 9, 1990, the city personnel director asked the commission in writing for a list ranking the applicants who had passed the written examination, and he reiterated this request at an April 26, 1990 commission meeting. The police chief who succeeded the retiring chief also asked for this information on that day. These requests were made to expedite the selection process and, in particular, to allow new officers to attend a September 1990 police training session.

**{¶ 8}** The commission did not comply with these requests, although on May 1, 1990 it provided the new police chief a list of the top twenty scorers in random order. The commission did not supply a complete list ranking the passing candidates because Commissioners Stroh and Wendt believed that an eligibility list, being based on both written and physical agility test results, would not "exist" until the agility test results were received. Since this concededly public record had not yet been prepared, these commissioners concluded that the commission had no obligation to disclose anything. Stroh and Wendt were also concerned that the "integrity" of the selection process might be compromised if they released a list of candidates according to their written test scores.

**{¶ 9}** On May 3, 1990, Boyle asked the commission in writing for "a listing of all successful candidates from the most recent Police Officers test[,] * * * [to] list the raw scores[,] and [to give] an indication of those people asked to participate in the Agility test of May 19, 1990." In response, the commission's secretary apparently forwarded (1) the list of top twenty written test scorers in random order that had been given to the police chief, (2) an alphabetical list of the top twenty written test scorers, which had also been provided to the police chief, but by "mistake," (3) a list of the top thirty-five scorers on the written test who were to take the physical agility test, (4) a list of candidates who had passed the written test and been placed on a waiting list, and (5) a list of candidates who had failed the written test.

**{¶ 10}** None of these lists, however, identified how candidates scored in relation to one another.  Stroh and Wendt refused to release this information, and, in a May 11, 1990 letter to Boyle, they explained:

"[S]ince the commission ruled that only * * * [the new police chief] was to have the names of the potential candidates and the ruling was made in an effort to accommodate the pressing need of reserving spaces for potential candidates in the various police academies, the commission determined that he alone was to receive these names prior to a list being established.  The commission further ruled that no list is established until a completion and passing of the physical agility test."

**{¶ 11}** On May 15, 1990, Boyle notified Stroh orally and in writing that he was being suspended from the civil service commission pursuant to Section 6, Article VI of the North Olmsted City Charter.  In the letter, Boyle advised Stroh that he could appeal the suspension at a city council meeting to be held that evening.  Boyle also told Stroh the reasons for this action:

"Through your recalcitrant actions during 1989 and 1990, with full knowledge of the North Olmsted Civil Service Commission Rules and Regulation [sic], Ohio Revised Code, and the legal opinion of the North Olmsted Director of Law, you have deprived this City of adequate police protection.

"On several occasions you have refused to provide public records to the Chief of Police, Mayor, Director of Public Safety and the Director of Personnel. By your actions, North Olmsted has been unable to fill vacancies in the Police Department, thus rendering them incapable, through manpower shortage, of providing the mandated level of security to the City."

**{¶ 12}** Boyle suspended Wendt about the same time and invited him to appeal at the May 15 city council meeting.  Wendt did not appear.  After refusing a continuance, Stroh attended the meeting and argued against his suspension.  The council voted five to two in favor of Stroh's suspension; two elected and three

4

appointed members made up the majority, two other elected members voted against Stroh's suspension.

{¶ 13} On May 23, 1990, Stroh wrote to the city council to explain again why he would not release a list ranking the candidates who had passed the written aptitude test. Stroh also demanded reinstatement. On June 5, 1990, Stroh met with Boyle, but still refused to disclose a list ranking the candidates and their written test scores. On June 12, 1990, Boyle gave Stroh formal notice that he had been relieved of his duties on the civil service commission. Wendt was permitted to retain his commission seat, in part because he had agreed to help administer the physical agility test.

{¶ 14} Stroh did not appeal his suspension and removal. Boyle purportedly appointed Alex Kovelan to serve Stroh's unexpired term on or about August 13, 1990. On August 21, Boyle announced to city council Kovelan's appointment to fill the vacancy created by Stroh's termination. Kovelan was apparently not sworn in until November 1990.

{¶ 15} On August 16, 1990, Cater, a friend and political ally of Stroh's, complained to Boyle about Stroh's removal and asked for his reinstatement. Boyle refused, and the law director advised Cater, in effect, that he would not institute a taxpayer action to gain Stroh's reinstatement. Cater filed this action in the court of appeals two months later, on October 23, 1990.

{¶ 16} On April 14, 1992, the court of appeals determined that Stroh had not been removed in accordance with charter procedures, which allowed only elected council members to vote on the suspension. However, the court refused to reinstate Stroh, holding that (1) a list of the aptitude test scores existed and should have been released as a matter of public record, and (2) Stroh's failure to release them was cause for his removal under the city charter. Thus, the court granted a writ of mandamus and ordered payment of any compensation lost due to Stroh's

termination.  The court did not reach Cater's claims that Stroh's rights to due process and equal protection were violated, and it denied his request for attorney fees.

{¶ 17} The cause is before this court upon an appeal and cross-appeal as of right.

_____

*Weiler & Weiler*, *Kevin P. Weiler* and *Cheri L. Westerburg*, for appellant and cross-appellee.

*Michael R. Gareau*, Director of Law, and *James M. Dubelko*, for appellees and cross-appellants.

_____

*Per Curiam.*

{¶ 18} For a writ of mandamus to issue, Cater must establish that North Olmsted has a clear legal duty to act as he demands, that he has a clear legal right to this relief, and that he has no other adequate remedy in the ordinary course of the law.  *State ex rel. Berger v. McMonagle* (1983), 6 Ohio St.3d 28, 29, 6 OBR 50, 51, 451 N.E.2d 225, 226.

{¶ 19} Cater argues that (1) a list of aptitude test scores had not been compiled and the civil service commission had no duty to create one under the public record laws, (2) even if the commission owed this duty, Stroh's failure to release the test scores was a mistake of law and not cause for his removal, and (3) the denial of attorney fees was an abuse of discretion.[1]  North Olmsted cross-appeals, arguing that (1) this cause is not actionable as a taxpayer suit, (2) Stroh's removal was procedurally proper, and (3) Cater delayed unreasonably in filing this action by waiting until Stroh could no longer appeal his removal and after appointment of his successor.  For the reasons that follow, we affirm.

---

1. Cater refers to, but does not develop, his constitutional claims or devote propositions of law to them.  Accordingly, we do not resolve these issues.

*Test Scores*

**{¶ 20}** Under Rules II(A)(1) and (2)(b) of the North Olmsted Civil Service Commission Rules and Regulations, police candidates must pass a written aptitude examination and a physical agility test to be placed on the eligibility list. Cater concedes that the eligibility list and the underlying test scores are public records. Section 4, Article VI of the North Olmsted Charter and R.C. 149.43. In the court of appeals, he argued that North Olmsted officials asked the commission for an eligibilty list before the physical agility test had been administered and, thus, before one of the two component test results existed. Cater maintained that no eligibility list could be compiled without the physical agility test scores and, further, that Stroh had no duty to release a list until the commission received those results.

**{¶ 21}** The court of appeals did not find a duty to release the eligibility list; instead, it made a factual finding that the commission had compiled a "raw," or preliminary list ranking the police candidates according to their aptitude exam scores and held that the raw list was also a "public record" as defined by R.C. 149.43(A)(1) ("any record kept by any public office," with some exceptions not relevant here). Cater disputes this finding, complaining that this record does not contain direct evidence of a raw list.

**{¶ 22}** The existence of a raw list may have been inferred from testimony that such lists had been provided to North Olmsted officials and the public in the past. Regardless, the record before us shows that each candidate's score had been written on his or her application, and the applications had been arranged according to rank. This proof establishes that the civil service commission possessed a multi-page record reflecting the results of the police aptitude exam, even if this information was not formally reduced to a list of one or more pages.

**{¶ 23}** Still, Stroh and the commission did not release the applications in response to North Olmsted's request for a list of the information they contained. Thus, Cater now contends that when the commission was asked for a list ranking

the applicants who had passed the aptitude test, no such list existed, and Stroh had no obligation to make one. In essence, Cater argues that public information responsive to a public record request need not be disclosed if it is not recorded in the format requested.

{¶ 24} Cater's argument is based on *State ex rel. Fant v. Mengel* (1992), 62 Ohio St.3d 455, 584 N.E.2d 664, *State ex rel. Scanlon v. Deters* (1989), 45 Ohio St.3d 376, 544 N.E.2d 680, and *State ex rel. Cincinnati Post v. Schweikert* (1988), 38 Ohio St.3d 170, 527 N.E.2d 1230, which held that compliance with public record laws does not require the creation of new documents to satisfy requests for public information. In *Fant*, a writ of mandamus to compel access to public records was denied because the requested information had not been recorded at all. In *Scanlon*, a writ of mandamus was denied because the requested information was available more completely and conveniently from another government source. In *Schweikert*, a writ of mandamus was allowed because the requested information had been incorporated into a report that was held to be a public record.

{¶ 25} *Fant*, *Scanlon*, and *Schweikert* do not discuss the specificity with which public records must be requested, yet Cater interprets them to say that public information may be denied if the public does not guess correctly the format in which such information is kept. We disagree. To demand such perfection in public record requests does not foster the broad access favored by *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1988), 38 Ohio St.3d 79, 526 N.E.2d 786. Moreover, the right to review public records containing the information on which reports or other compilations subject to public disclosure are based is inherent in *Schweikert*, providing the records are not available elsewhere as per *Scanlon*, *supra*, at 379, 544 N.E.2d at 683.

{¶ 26} Furthermore, we agree with North Olmsted that Cater is "quibbling" to distinguish between the documents containing the aptitude test scores and a list of this information. The commission invited the thirty-five candidates who had

scored highest on the aptitude exam to participate in the physical agility test, thus effectively creating the list sought by the city. Moreover, the commission was obligated to create such a list regardless, as Section 4, Article VI of the charter requires the commission to "keep a record of its proceedings and examination, which shall be open to public inspection."

{¶ 27} Based on the foregoing, North Olmsted's arguments have merit, while Cater's position disserves the policy favoring disclosure of public records and is not supported by his authority. We, therefore, affirm the court of appeals' findings that the aptitude test scores were public record and that the commission, under Stroh's direction, had a duty to release them.

*Justification for Stroh's Removal*

{¶ 28} Section 6, Article VI of the city charter, the only provision cited for relieving civil service commissioners of their duties, states:

"The Mayor may at any time suspend any Commissioner for inefficiency, neglect of duty, malfeasance, misfeasance or nonfeasance in office, * * * provided, however, that such suspension shall not become final without the concurrence of two-thirds of the elected members of the Council."

{¶ 29} Cater argues that North Olmsted had no cause to suspend and remove Stroh. The court of appeals agreed that Stroh's refusal to produce the aptitude test scores was a well-intentioned, though ill-conceived, attempt to "preserve the integrity of the hiring process." Cater contends that Stroh is therefore not guilty of misfeasance, malfeasance, nonfeasance, or neglect of duty under the charter.

{¶ 30} But having found that Stroh had a duty, as chairman of the civil service commission, to disclose the aptitude test scores, we must also find that his refusal constituted nonfeasance. "Nonfeasance," according to *State ex rel. Neal v. Ohio Civ. Serv. Comm.* (1947), 147 Ohio St. 430, 434, 34 O.O. 356, 357, 72 N.E.2d 69, 71, is "'the omission of an act which a person ought to do,'" and Stroh did not

observe the public records laws. The duty to disclose these records, whether generated by the city charter or statute, is not subject to any requirement of intent, such that Stroh was relieved of compliance to the extent he believed himself to be acting lawfully. Accord *State ex rel. Randles v. Hill* (1993), 66 Ohio St.3d 32, 607 N.E.2d 458 (inadvertence or mistake no excuse for noncompliance with open meetings law). For this reason, North Olmsted has no duty to reinstate Stroh.

*Attorney Fees*

**{¶ 31}** R.C. 733.61 provides:

"If the court hearing a case under section 733.59 of the Revised Code is satisfied that the taxpayer had good cause to believe that his allegations were well founded, or if they are sufficient in law, it shall make such order as the equity of the case demands. In such case the taxpayer shall be allowed his costs, and, if judgment is finally ordered in his favor, he may be allowed, as part of the costs, a reasonable compensation for his attorney."

**{¶ 32}** Cater mainly complains that the court of appeals abused its discretion by failing to review the equities of this case. His complaint is unjustified. Before denying attorney fees, the court of appeals referred to its previous discussion of the equities, where it had explained:

"[T]he equities reveal[] a substantial balance of good intentions and sincere efforts of fault and blame. The evidence indicates Mr. Stroh was motivated to preserve the integrity of the hiring process, but he did not comply with Ohio statutory law and perhaps jeopardized the safety of the community. Moreover, the problems in staffing the police force had been pending for months. Although his interpretation of the rules was incorrect, it was not irrational, and at least one member of the Council agreed with him. [North Olmsted officials] misinterpreted the Charter and gave Mr. Stroh little time to prepare his defense. Nevertheless he fully presented his position and was satisfied with it."

**{¶ 33}** These are not the equities Cater argues are at work here. He emphasizes his success in enforcing the charter removal provisions, the need to hold public officials accountable and ensure their compliance with local laws, the cost to individual taxpayers who sue for such compliance, the possible influence of partisan politics, and the need to discourage public officials from future infractions.

**{¶ 34}** Attorney fees are allowable when a tangible or intangible benefit is bestowed on the public, including the prevention of illegal government activity. *Billington v. Cotner* (1974), 37 Ohio St.2d 17, 19, 66 O.O.2d 9, 10, 305 N.E.2d 805, 807; *State ex rel. Hirshler v. Frazier* (1980), 63 Ohio St.2d 333, 335, 17 O.O.3d 418, 419, 410 N.E.2d 1253, 1254-1255. However, attorney fees in a taxpayer action are entirely within the trial court's discretion, *id.* at 335, 17 O.O.3d at 419, 410 N.E.2d at 1254, and here, the court of appeals plainly "exercise[d] its discretion in considering the allowance of attorney fees." *State ex rel. White v. Cleveland* (1973), 34 Ohio St.2d 37, 63 O.O.2d 79, 295 N.E.2d 665, paragraph three of the syllabus; *State ex rel. Gravill v. Fuerst* (1986), 24 Ohio St.3d 12, 13-14, 24 OBR 10, 11, 492 N.E.2d 809, 810. This is sufficient to avoid reversal, unless the court's decision was plainly wrong, which does not appear from this record. Accord *Harrison v. Judge* (1992), 63 Ohio St.3d 766, 772, 591 N.E.2d 704, 708.

**{¶ 35}** The denial of attorney fees, therefore, is affirmed.

*Actionability as Taxpayer Suit*

**{¶ 36}** North Olmsted argues that the purpose of Cater's suit was not, as he claims, to enforce the public's right to proper execution of its charter removal provisions requiring a two-thirds vote of elected council members. The city charges that Cater instead intended to gain Stroh's reinstatement, and that this private motive is not actionable under R.C. 733.59. The city also suggests that appeal or quo warranto is the appropriate remedy here.

**{¶ 37}** Cater lacked standing either to appeal Stroh's removal or to pursue quo warranto, even as a taxpayer. *State ex rel. Annable v. Stokes* (1970), 24 Ohio

St.2d 32, 53 O.O.2d 18, 262 N.E.2d 863; R.C. 733.58 and 733.59. Moreover, we have said that when no other adequate remedy exists, "[m]andamus is the proper remedy to restore a party to the possession of an office from which he has been illegally removed." *State ex rel. Moyer v. Baldwin* (1908), 77 Ohio St. 532, 83 N.E. 907, at paragraph one of the syllabus.

**{¶ 38}** The court of appeals found taxpayer standing based on *Cleveland ex rel. Neelon v. Locher* (1971), 25 Ohio St.2d 49, 52, 54 O.O.2d 189, 191, 266 N.E.2d 831, 834, which, while not involving a taxpayer suit, recognized the public's interest in mandamus actions to force compliance with charter provisions:

"If the members of a legislative body can ignore, with impunity, the mandates of a constitution or a city charter, then it is certain that the faith of the people in constitutional government will be undermined and eventually eroded completely."

**{¶ 39}** North Olmsted argues that *Cleveland* should be distinguished. The city anticipates its next argument and claims that it did not refuse to comply with an unambiguous charter provision, as was the case in *Cleveland*. North Olmsted also emphasizes its countervailing concerns—enforcing public records laws and providing adequate police protection—which *Cleveland* did not involve.

**{¶ 40}** In *State ex rel. Caspar v. Dayton* (1990), 53 Ohio St.3d 16, 20, 558 N.E.2d 49, 53, we held that municipal policemen suing for recognition of their own statutory vacation benefits had not brought a viable taxpayer action because they had not attempted to enforce a public right. *Caspar* applied *State ex rel. White v. Cleveland*, *supra*, at 40, 63 O.O.2d at 81, 295 N.E.2d at 668, which recognized taxpayer claims in mandamus actions as a means to protect public rights:

"In the present action, it is clear that R.C. 149.43 establishes a public right to the inspection and copying of public records and imposes upon municipal corporations the duty to permit same.

"It is also clear that appellant City of Cleveland refused to comply with that mandatory duty, forcing appellees to maintain an action in mandamus to compel the enforcement of such duty. In so doing, the appellees, regardless of any private or personal benefit, have enforced a right of action on behalf of and for the benefit of the general public. This action is, therefore, properly catagorized as a 'taxpayer's action.'"

{¶ 41} Here, Cater asserts the public's right to the services of a public official who is purportedly performing in accordance with charter provisions. This represents action taken on behalf of the public, and is a sufficient basis upon which to institute a taxpayer action, notwithstanding that Cater's motives may not have been purely philanthropic. Accordingly, the court of appeals' finding that Cater had standing to pursue his claim as a taxpayer action was not error.

*Propriety of Removal*

{¶ 42} Next, North Olmsted asks for reversal of the finding that Stroh's removal was procedurally flawed. The court of appeals held that the removal was not supported by "the concurrence of two-thirds of the elected members of the Council," as required by Section 6, Article VI of the charter. The record establishes that four of the seven city council members were elected, and those four voted in a tie as to Stroh's removal, which did not establish the requisite two-thirds concurrence.

{¶ 43} Basically, North Olmsted argues that Section 6, Article VI of the charter should be read without the word "elected" because it does not reflect the framers' true intent. The city urges consideration of the charter as a whole to determine this intent, and it cites various instances when council action requires a two-thirds concurrence and other times when a majority vote of all council members is necessary. Because "no discernible pattern" emerges, North Olmsted concludes that the word "elected" is just "loose language." The city also complains

that giving effect to the word "elected" will cause "extreme results," including the denial of voting privileges to appointed representatives of city wards.

{¶ 44} The court of appeals rejected these arguments on the authority of *State ex rel. Gerhardt v. Krehbiel* (1974), 38 Ohio St.2d 90; 67 O.O.2d 92, 310 N.E.2d 251, *Cleveland Elec. Illum. Co. v. Cleveland* (1988), 37 Ohio St.3d 50, 524 N.E.2d 441, and *Fuldauer v. Cleveland* (1972), 32 Ohio St. 2d 114, 61 O.O.2d 374, 290 N.E.2d 546. We concur.

{¶ 45} The syllabus in *Gerhardt* states:

"Where a municipal charter prescribes the manner for the removal of municipal officers, any attempt by the municipality's legislative body to remove an officer in a manner at variance or in conflict with the charter's directives is a nullity."

{¶ 46} In *Cleveland Elec. Illum.*, *supra*, at paragraph three of the syllabus, we said:

"In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used. (*Columbus-Suburban Coach Lines v. Pub. Util. Comm.* [1969], 20 Ohio St.2d 125, 127, 49 O.O.2d 445, 446, 254 N.E.2d 8, 9, followed.)"

{¶ 47} In *Fuldauer*, *supra*, at 118, 61 O.O.2d at 376, 290 N.E.2d at 549, we said that the feasibility or wisdom of charter provisions is "not a matter for our consideration."

{¶ 48} These cases provide ample justification for the court of appeals' interpretation of Section 6, Article VI of the North Olmsted Charter. Accordingly, the court of appeals did not err in finding that the city failed to comply with the charter in removing Stroh.

## *Laches*

{¶ 49} Finally, North Olmsted maintains that Cater delayed unreasonably in filing this action by waiting to do so until October 23, 1990—five months after

Stroh's May 15 suspension, four months after the formal notice of his removal on June 12, at least three months after his administrative appeal period ended, and two months after Kovelan's appointment. The city also argues that the delay caused prejudice because Boyle waited the months after June 12, expecting some challenge to Stroh's removal, and appointed Kovelan only when none came. Kovelan, North Olmsted claims, was also prejudiced because he received the appointment.

{¶ 50} The elements of a laches defense are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for such delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party. *State ex rel. N. Olmsted Firefighters Assn. v. N. Olmsted* (1992), 64 Ohio St.3d 530, 536-537, 597 N.E.2d 136, 142. A successful laches defense requires the person for whose benefit the doctrine will operate to show that he has been materially prejudiced by the delay of the person asserting the claim. *State ex rel. Madden v. Windham Exempted Village School Dist. Bd. of Edn.* (1989), 42 Ohio St.3d 86, 90, 537 N.E.2d 646, 649-650. In mandamus actions, courts have discretion to find laches regardless of whether the writ is barred by the statute of limitations. *State ex rel. Moore v. Sanders* (1981), 65 Ohio St.2d 72, 75, 19 O.O.3d 264, 265-266, 418 N.E.2d 1339, 1341.

{¶ 51} The court of appeals did not find unreasonable delay because (1) Cater filed this action two months after the denial of his requests for Stroh's reinstatement and pursuit of a taxpayer action, and (2) Cater made the latter request, which we have said is a jurisdictional prerequisite for taxpayer suits under R.C. 733.59, *State ex rel. Citizens for a Better Portsmouth v. Sydnor* (1991), 61 Ohio St.3d 49, 54, 572 N.E.2d 649, 652, within three days after Kovelan's appointment. The court did not find material prejudice because it suspected that Kovelan had not been sworn in and, thus, that his appointment did not become effective, until one month or so after Cater filed his suit.

{¶ 52} North Olmsted complains that Cater acquiesced until Kovelan's appointment was complete, and this made Stroh's reinstatment impossible, as the city charter did not provide for Kovelan's removal. The city cites *State ex rel. Spellacy v. Jaster* (1936), 131 Ohio St. 214, 5 O.O. 557, 2 N.E.2d 268, and *State ex rel. Stoer v. Raschig* (1943), 141 Ohio St. 477, 26 O.O. 56, 49 N.E.2d 56, in which writs of mandamus to compel civil service employees' reinstatements were denied, at least in part, because each employee's position had already been filled or abolished. See, also, *State ex rel. Moore v. Sanders*, *supra*, 65 Ohio St.2d at 75, 19 O.O.3d at 266, 418 N.E.2d at 1341, and *State ex rel. Leis v. Black* (1975), 45 Ohio App.2d 191, 196, 74 O.O.2d 270, 273, 341 N.E.2d 853, 857 (prejudice to nonparties considered in denying mandamus relief). But, see, *State ex rel. Moyer v. Baldwin*, *supra* (city detective restored to employment despite repeal of ordinance creating his office, enactment of second ordinance creating two new offices, and appointments).

{¶ 53} Cater's taxpayer action must be distinguished from these cases. As a taxpayer faced with the prospect of suing on the public's behalf, he no doubt hoped to avoid duplicating whatever efforts Stroh had made to individually contest the government action taken against him. Thus, Cater's delay until after Stroh's appeal period and the mayor's refusal to reconsider the removal is reasonable. The additional two months it took Cater to file suit, given this chronology, does not seem excessive.

{¶ 54} Moreover, the city's argument that it prejudicially changed its position by appointing Kovelan overlooks that an appointment is void if made before a vacancy existed, *State ex rel. Norman v. Viebranz* (1985), 19 Ohio St.3d 146, 19 OBR 369, 483 N.E.2d 1176, and that Kovelan's appointment was susceptible to challenge through *quo warranto* despite any absence of the city charter to similarly provide. See *State ex rel. Wilson v. Gulvas* (1992), 63 Ohio St.3d 600, 589 N.E.2d 1327. In view of the holding that Stroh was improperly

removed from the civil service commission, his office did not become legally vacant until the appropriate elected city council members concurred, per the city charter, or Stroh's term ended without his reappointment. The purported prejudice to the city due to Cater's delay, therefore, is illusory.

*Conclusion*

**{¶ 55}** Based on the foregoing, we hold that North Olmsted had cause to remove Stroh as chairman of the civil service commission due to his failure to provide the aptitude test scores as requested, but that his removal was procedurally flawed. Moreover, we agree with the court of appeals' findings that the test scores were matters of public record and that this cause is actionable as a taxpayer suit. Finally, we concur in the rejection of North Olmsted's laches defense and in the denial of attorney fees. The court of appeals' judgment, therefore, is affirmed.

*Judgment affirmed.*

MOYER, C.J., A.W. SWEENEY, WRIGHT, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs in judgment only.

———————————